McGANN & MARSH CO., INC.,
Appellant-Plaintiff,

v.

K & F MANUFACTURING CO., INC.,
Appellee-Defendant.

K & F MANUFACTURING CO., INC.,
Appellee-Counterclaimant,

v.

McGANN & MARSH CO., INC.,
Appellant-Counterdefendant.

K & F MANUFACTURING CO., INC.,
Appellee-Third Party Plaintiff,

v.

John J. McGANN, Jr., Appellant-Third
Party Defendant.

No. 3–877A213.

Court of Appeals of Indiana,
Third District.

Feb. 19, 1979.

Richard D. Bonewitz, Hammerschmidt & Bonewitz, South Bend, for appellant.

Franklin A. Morse, II, Nelson J. Vogel, Jr., Thornburg, McGill, Deahl, Harman, Carey & Murray, South Bend, for appellee.

STATON, Judge.

McGann & Marsh Co., Inc. brought an action to recover commissions from K & F Manufacturing Co., Inc., under agreements executed by the parties. K & F filed a counterclaim, alleging that M & M refused to exercise its best efforts on behalf of K & F. Without making findings of fact, the trial court rendered judgment against M & M on the complaint, and in favor of M & M on the counterclaim. Both parties filed motions to correct errors, which were denied. On appeal, M & M argues that the trial court improperly denied it recovery under a valid and enforceable contract with K & F. We find that the trial court committed error and we reverse.

The dispositive issue raised by M & M concerns whether the "Appointment of Sales Agent" document executed by the parties constitutes a valid and enforceable contract.[1]

The lengthy trial record contains numerous details concerning the events leading up to the execution of two agreements by the parties. Many of these "facts" are not relevant or necessary to support our disposition.

In the late 1960s, John McGann, majority stockholder of M & M, became interested in selling "saddles" and "lock-ups," devices used to adapt new printing plates to existing printing presses. He came in contact with Alex Kocsis and Rudy Fermi, who were then in the sheet metal trade. At his behest, they began working to develop and produce the devices. McGann approached representatives of W. R. Grace & Co. regarding distribution of the saddles and lock-ups.

In 1970, M & M combined with Kocsis and Fermi to form a new corporation called McGann and Marsh Manufacturing Co., Inc. M & M was responsible for sales, while Kocsis and Fermi performed the engineering and mechanical work. Grace, the primary customer of M & M Mfg., eventually sought to establish an exclusive sales arrangement with M & M Mfg. In August, 1971, M & M, M & M Mfg., and Grace signed an agreement establishing Grace as the sole customer of M & M Mfg. with respect to lock-up devices. Grace then attempted to obtain such an arrangement with respect to saddles. McGann opposed such an arrangement and finally decided to terminate M & M's investment in M & M Mfg.

1. In light of our disposition of the case, we need not consider the error M & M raised concerning the testimony of Daniel Jenkins.

In October, 1971, McGann contacted Kocsis and offered to sell M & M's stock in M & M Mfg. Negotiations began. Initially a purchase price of $200,000 was discussed. The parties decided that this sum would be paid in installments corresponding in part to M & M Mfg.'s sales. Then McGann, who was well known in the graphic arts (printing and publishing) industry, offered to promote M & M Mfg.'s products to customers other than Grace in exchange for a 5% commission on sales of saddles and graphics arts equipment to customers other than Grace.[2] McGann knew M & M Mfg. was likely to sign an exclusive sales agreement with Grace, but he wanted a share of what he expected to be a growing business in the event the exclusive arrangement failed. Fermi also anticipated the exclusive arrangement with Grace and recognized the possibility that no commissions would ever be paid to M & M. Fermi and Kocsis agreed to pay the commission. No specific duties on the part of M & M were ever discussed.

A meeting was held before the contract was drawn. Frederick K. Baer, an attorney, represented M & M Mfg. with respect to the proposed purchase of stock. The terms of the proposed contract such as purchase price, commissions, and a non-compete provision, were discussed as a "package" transaction. Baer decided that several separate agreements would be necessary.[3] Ultimately, Baer prepared two agreements, one entitled "Appointment of Sales Agent," and another entitled "Agreement for Purchase of Stock."

The documents were both executed on December 15, 1971, at Baer's offices. On the same day, resolutions were prepared and executed by the officers of both M & M and M & M Mfg., reflecting the execution of the agreements. Shortly thereafter, M & M Mfg. changed its name to K & F

Manufacturing Co., Inc. The provisions of the "Agreement for Purchase of Stock" were carried out as contemplated by the parties.

After M & M divested itself of its stock in M & M Mfg., the latter executed an exclusive sales agreement with Grace. In 1975, due to a decrease in business with Grace, K & F terminated the exclusive arrangement with Grace. K & F began selling products directly to customers other than Grace. McGann contacted K & F regarding M & M's 5% commission on such sales. K & F refused to pay M & M any commissions. K & F's answers to interrogatories read into evidence indicate that K & F had sales of $1,797,037.00 through July 31, 1976, to customers other than Grace.

In the action below, M & M sought enforcement of the "Appointment of Sales Agent" agreement. M & M presented the court with two contemporaneously-executed agreements. The "Agreement for Purchase of Stock," hereinafter referred to as the "Stock Agreement," deals with several different matters: M & M's sale of 510 shares of M & M Mfg. stock for a purchase price of $200,000, payable in installments; delivery of the stock into an escrow account; voting and dividends of the stock; security for the sale; prospective change of M & M Mfg.'s name to K & F; assignment of M & M's lease rights; an agreement not to disclose M & M Mfg.'s trade secrets; an agreement by M & M, McGann and Marion Marsh not to compete with M & M Mfg.; resignation of McGann and Marsh as officers and appointment of Fermi and Kocsis; and a mutual release clause which states the following:

> "Each party hereby releases the other from any and all claims of any kind or nature whatsoever, excepting only the contractual provisions provided for in this agreement and any other agreement executed contemporaneously herewith."

2. Ordinarily a 23% commission was paid to a salesman in the industry. In this case the parties did not anticipate being able to trace particular sales to M & M's efforts.

3. Baer was concerned with the tax consequences of the agreements. Baer did not want

the Internal Revenue Service to consider commissions paid to M & M as part of the purchase price for the stock. Commissions would be deductible as operating expenses of K & F, whereas the purchase of stock would be a capital expenditure.

The Stock Agreement also states that it is enforceable by any party, with reasonable attorney's fees. It was signed by M & M, M & M Mfg., McGann, Marsh, and the escrow agent.

The "Appointment of Sales Agent" agreement, hereinafter referred to as the "Commissions Agreement," is set forth in its entirety:

## "APPOINTMENT OF SALES AGENT

"THIS AGREEMENT made this 15th day of December, 1971, between McGANN & MARSH MANUFACTURING CO., INC., hereinafter designated as 'Principal', and McGANN & MARSH CO., INC., hereinafter designed the 'Agent',

"WITNESSETH:

"1. This agreement shall be valid and binding upon each of the parties hereto for the term of ten (10) years from the date of execution hereof.

"2. The Agent shall have the right to purchase any graphic arts equipment produced or sold by the Principal on such terms and conditions as Principal and Agent shall agree.

"3. If Principal sells any graphic arts equipment produced or sold by it without the aid, assistance or recommendation of the Agent, the Principal shall pay the Agent five (5%) per cent commission on such sales.

"4. If the Principal sells Saddles produced or sold by it, which Saddles are defined as mechanical devices designed to adapt a printing plate to a printing cylinder, the Principal shall pay the Agent a commission of five (5%) per cent on such sales, whether or not made with the aid, assistance or recommendation of the Agent. The Agent shall not be entitled to any commission for sales of Saddles or any other items produced or sold by the Principal to W. R. Grace & Co., a Connecticut corporation, or any subsidiary affiliate or successor of said company.

"5. The Principal shall pay the Agent promptly for all commissions due the Agent under this agreement, on or before the 10th day of the month following receipt of payment from the customer.

"6. The Agent shall have the right to make sales of said graphic arts equipment and Saddles anywhere in the United States, subject to the terms herein contained. All transactions involving such sales, except purchases made directly by the Agent, shall be accomplished directly between the Principal and Agent's customer.

"7. Except with respect to graphic arts equipment the sales of which shall be exclusively with the Agent, nothing herein contained shall prohibit Principal from making its own sales anywhere directly or through other agents, subject to its commitment to pay the Agent a commission, when due, as herein provided for.

"8. The Principal shall have the sole option to accept or reject any business submitted by Agent and no commission shall be due the Agent where the business has been rejected.

"9. In all events the customer shall deal directly with the Principal and the Agent shall have no authority to bind the Principal or to incur any liability on Principal's behalf unless authorized to do so in writing.

"IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and date first above written.

"Principal: McGANN & MARSH MANUFACTURING CO., INC.
By [s] Rudy Fermi
President

"ATTEST:
"By [s] Joyce Fermi
Secretary
"Agent: McGANN & MARSH CO., INC.
By [s] John J. McGann, Jr.

President
"ATTEST:
"By [s] Marion Marsh
Secretary"

As pointed out by K & F, the Commissions Agreement contains no separate statement of consideration for the 5% commissions K & F arranged to pay M & M. K & F argues that the agreement is unenforceable for that reason. M & M argues the court should have found consideration by either construing the Stock Agreement and the Commissions Agreement together or by resorting to parol evidence which would have proved that the agreement was supported by consideration.

We find that the Commissions Agreement is a valid and enforceable contract supported by consideration.

█ The construction of a contract is a question to be determined by the court as a matter of law.[4] *Kleen Leen, Inc. v. Mylcraine* (1977), Ind.App., 369 N.E.2d 638; *Wilson v. Kauffman* (1973), 156 Ind.App. 307, 296 N.E.2d 432. The determination of the facts upon which the construction of a contract rests becomes a matter for the jury only when the meaning of ambiguous contract terms is to be determined by resort to parol evidence.

█ In determining the contract between the parties, the court may resort to various rules of contract construction to discover the intention of the parties. If possible, the court should construe an agreement to be valid rather than void. *Board of Directors, Ben Davis Conservancy District v. Cloverleaf Farms, Inc.* (1977), Ind.App., 359 N.E.2d 546; *In Re Estate of McClain v. McClain* (1962), 133 Ind.App. 645, 183 N.E.2d 842. Thus, a contract to pay money purports that a valid consideration was given. *Brown v. Addington* (1944), 114 Ind. App. 404, 52 N.E.2d 640.[5]

█ In interpreting the contract, the court looks first to the intent of the parties as expressed in the language of the contract. *Tastee-Freez Leasing Corp. v. Milwid* (1977), Ind.App., 365 N.E.2d 1388. If a contract is ambiguous, that is, if it is susceptible of two conflicting constructions, the court may consider parol evidence in order to resolve the ambiguity.[6] In the present case, neither party is arguing that the Commissions Agreement is ambiguous in its meaning. K & F is arguing that the agreement is void for lack of consideration; M & M argues that consideration for the agreement is found in the contemporaneously-executed Stock Agreement. In this case, M & M has sought to have the court invoke a special rule of contract construction, that is,

"in the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction or subject-matter are construed together in determining the contract."

*Urbanational Developers, Inc. v. Shamrock Engineering, Inc.* (1978), Ind.App., 372 N.E.2d 742, 754. *See also East Side Mercury Sales, Inc. v. Charlie Stuart, Inc.* (1962), 134 Ind.App. 538, 179 N.E.2d 204; *Baker v. Gordon* (1960), 130 Ind.App. 585, 164 N.E.2d 118; *Stair v. Oswalt* (1951), 121 Ind.App. 382, 97 N.E.2d 375.

█ We must examine the two agreements to determine whether they are susceptible to application of the rule of construction that they be construed together.[7] We note first that neither the Stock Agreement nor the Commissions Agreement con-

---

4. In its brief, K & F incorrectly characterizes the trial court's construction of a contract as a question of fact and makes its arguments accordingly.

5. In *Brown*, the court allowed the admission of parol evidence to show that consideration was given. In this case we do not need to consider parol evidence since we have invoked a rule of construction which allows finding of consideration in a contemporaneously-executed agreement.

6. If a contract is ambiguous, the contract is construed against the party whose attorney prepared it. *Mandle v. Owens* (1975), Ind. App., 330 N.E.2d 362. However, when a court construes an unambiguous written contract, the question of who prepared it is immaterial.

7. *See, e. g., Chelsea Industries, Inc. v. Florence* (1970), 358 Mass. 50, 260 N.E.2d 732, wherein the court went through a step-by-step construction of two contracts, a stock purchase agreement and an employment agreement, that were part of the same transaction.

tains any indication that it is *not* intended to be construed together with the other.[8] The agreements were executed together on December 15, 1971. The parties to the agreements are the same in essential respects (the Stock Agreement has additional parties in that McGann and Marsh each signed in his individual capacity and an escrow agent signed). The fact that the two agreements involved the same transaction was not disputed.[9] The Stock Agreement, which contains various different considerations, expressly states that the parties were not released from any other agreement executed contemporaneously therewith.

■ When we construe the Commissions Agreement and the Stock Agreement together, we are not attempting to remake the agreement or consolidate the separate agreements. We are merely attempting to determine what the agreement between the parties is. We conclude that the failure of the Commissions Agreement to state consideration is not fatal to the agreement. As noted in *Urbanational Developers, supra*, 372 N.E.2d 742, 754:

> "[T]he instruments need not each contain a separate mention of consideration, but that the consideration for one instrument may be found in the contemporaneous instrument. *Wellmore Builders, Inc. v. Wannier* (1958), 49 N.J.Super. 456, 140 A.2d 422, 426."

The consideration M & M promises K & F, as detailed in the Stock Agreement, supports K & F's promise to pay commissions, which is contained in the contemporaneously-executed Commissions Agreement.

We note that the consideration M & M promises K & F is as follows: 510 shares of stock in M & M Mfg.; a promise on the part of M & M, McGann and Marsh not to participate in M & M Mfg.'s (later K & F's) business, except as its agent, for a period of ten years; an assignment of lease rights; a promise not to disclose trade secrets; and a release of claims. The consideration given by K & F in return, as detailed in the Stock Agreement is the purchase price of the stock, in the sum of $200,000, and a release of claims. When we construe the agreements together, a corollary conclusion is unescapable: that is, part of the consideration offered to M & M by K & F in completing the transaction is contained in the Commissions Agreement in the form of a 5% Commission on sales of graphics arts equipment and saddles to customers other than Grace.

In summation, we conclude that the judgment of the trial court was contrary to fact and contrary to law. The court had no factual basis for *not* construing the two contemporaneously-executed agreements together. The court was required to find that the consideration contained in the Stock Agreement supported K & F's promise found in the Commissions Agreement.[10] Under the valid Commissions Agreement, M & M is entitled to payment of commissions on certain goods sold by K & F to customers after the exclusive agreement with Grace was terminated.

■ Finally, K & F's counterclaim, alleging that the Commissions Agreement is

---

8. The trial court admitted an abundance of parol evidence related to the parties' intentions in making the agreements. While we consider such evidence to be superfluous, we note that such evidence did not provide any factual basis for *not* construing the contracts together. Both M & M and K & F clearly viewed the separate promises contained in the two agreements as integral aspects of the same transaction. Two different agreements were drawn up by Baer to satisfy tax purposes. The lack of consideration in the Commissions Agreement appears to have been inadvertent. Clearly, in exchange for M & M's stock and other promises, K & F accepted responsibility for payment of commissions to M & M.

9. K & F claims that, while the agreements were part of the same transaction, they relate to different subject matters and therefore should not be construed together. We will not consider the argument, since the rule we have applied states that contemporaneously-executed contracts relating to the same transaction or subject matter are construed together to determine the contract.

10. We do not deal with the tax consequences of our decision in this case. *But see In Re Steen*, 509 F.2d 1398 (9th Cir. 1975).

void due to a *failure* of consideration, must fail. We note that, in light of the express language of the Commissions Agreement, a court could not have found that M & M has an implied duty to exercise its best efforts on behalf of K & F. The Commissions Agreement explicitly states that commissions are to be paid on goods sold by K & F with or without the aid of M & M. Further, K & F failed to preserve this error by its failure to argue the issue with any specificity in its cross-motion to correct errors, as required by Ind.Rules of Procedure, Trial Rule 59(B).

This cause is reversed and remanded to the trial court for a determination of the amounts K & F must pay M & M under the Commissions Agreement.

GARRARD, P. J., and CHIPMAN, P. J. (by designation), concur in result.