Thomas and Diane RUTH,
Plaintiffs-Appellants,

v.

FIRST FEDERAL SAVINGS AND LOAN
ASSOCIATION OF LaPORTE COUN-
TY, Defendant-Appellee.

No. 3–1185A304.

Court of Appeals of Indiana,
Third District.

May 22, 1986.

V. Michael Drayton, Sallwasser and McCain, LaPorte, for plaintiffs-appellants.

C.T. Kitowski, Michigan City, for defendant-appellee.

GARRARD, Judge.

Thomas and Diane Ruth (Ruths) brought this action against the First Federal Savings and Loan Association of LaPorte County (First Federal), seeking a declaratory judgment regarding the status of First Federal's lien against the Ruths' real estate at 5646 West Johnson Road in LaPorte, Indiana. The dispute centers on what annual interest rate is applicable to the lien. The Ruths' complaint also sought damages for First Federal's earlier refusal of tender, for a set off and reasonable attorney fees pursuant to the Truth in Lending laws, and for costs.

The Ruths had purchased the real estate from Dennis Tolton (Tolton), a house builder and developer, on a land contract executed on May 3, 1980. The purchase price included a $6,000 down payment and a $53,900 balance, together with an annual interest rate of thirteen and one-half percent (13½%). The land contract instructed the Ruths to make payments directly to First Federal. The real estate was sold subject to an open-end mortgage which Tolton had given to First Federal.

Tolton originally gave First Federal the mortgage on January 10, 1979, at an annual interest rate of ten percent (10%) as security for a promissory note. The mortgage was due on January 10, 1980, but on that date Tolton and First Federal entered into an extension agreement whereby the annual interest rate was increased to eleven and one-half percent (11½%) and the new due date was set for July 10, 1980.

On May 3, 1980, the same day on which the land contract was executed, Tolton entered into an adjustment agreement and apparently negotiated a loan settlement statement with First Federal. The purpose of the adjustment agreement was to convert the obligation of Tolton from one being due in full on July 10, 1980 to one requiring monthly payments toward satisfaction of the debt. The loan settlement agreement increased the annual interest rate on Tolton's mortgage to thirteen and one-half percent (13½%) and modified the amount due to $53,900; both changes were purportedly made to coordinate the mortgage with the land contract.

On September 3, 1982, Tolton filed bankruptcy. First Federal was aware of the bankruptcy and filed a proof of claim in order to establish the balance due on the mortgage as a secured claim. The Ruths, however, were apparently never notified although Tolton had listed the Ruths as third parties in possession of his real estate under the land contract. Tolton was eventually discharged from bankruptcy and the bankruptcy trustee's report of "no distribution" was approved, closing the bankruptcy estate on April 22, 1983.

Tolton then signed over his interest in the real estate to the Ruths by executing a warranty deed on September 15, 1983. The Ruths stopped making payments to First Federal in November of 1983 and filed their complaint to determine the status of First Federal's mortgage lien on March 29, 1984. The trial court concluded that First Federal held a valid mortgage on the real estate at an annual rate of 13½%. The trial court also determined that Tolton's bankruptcy did not affect First Federal's mortgage security and that the Truth in Lending regulations did not apply to the May 3, 1980 transaction.

The Ruths have perfected this appeal, raising three issues for our review:

1) The admission of First Federal's "Exhibit 6," which represents the loan settlement agreement entered into between Tolton and First Federal.

2) The conclusion that Tolton's discharge in bankruptcy had no effect on First Federal's lien.

3) The denial of a fair trial when the applicability of the Truth in Lending regulations was determined.[1]

The loan settlement agreement entered into between Tolton and First Federal explicitly sets forth the annual interest rate on Tolton's indebtedness to First Federal as 13½%. The Ruths, attempting to minimize the annual interest rate attached to `First Federal's lien, objected to the admission of the loan settlement agreement at trial.

■ On appeal, the Ruths' first objection to the loan settlement agreement is that the document is hearsay. It is a familiar appellate rule, however, that on review this court cannot consider an objection different from that which was raised at trial. *In re Wardship of B.C.* (1982), Ind., 441 N.E.2d 208, 212; *Pilkington v. Hendricks County Rural Elec.* (1984), Ind.App., 460 N.E.2d 1000, 1010. The Ruths' objection to the admission of the loan settlement agreement at trial invoked the parol evidence rule and our review of the record reveals no hearsay objection to this document whatsoever. Therefore, the Ruths are precluded from raising such an objection for the first time on appeal.

As indicated, the Ruths' objection at trial was that the loan settlement agreement is violative of the parol evidence rule, which provides that:

"When two parties have made a contract and have expressed it in writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."

3 Corbin, on Contracts, Section 573, at 537 (1960); 13 I.L.E. *Evidence*, Section 181, p. 55 (West 1959). The parol evidence rule is designed to provide certainty and stability to those transactions which have been reduced to writing. *Creech v. LaPorte Production Credit Assoc.* (1981), Ind.App., 419 N.E.2d 1008, 1010; 32A C.J.S. *Evidence*, Section 851, p. 215 (1964).

In support of their argument the Ruths seek to characterize the adjustment agreement that was entered into between Tolton and First Federal on May 3, 1980 as the complete transaction modifying the underlying indebtedness between Tolton and First Federal as represented by the mortgage note. The Ruths argue that the adjustment agreement converted the obligation of Tolton to pay off his indebtedness on July 10, 1980 to an obligation to pay off the indebtedness on a month to month basis. The Ruths then argue that because the adjustment agreement did not specifically set an annual interest rate but did refer back to the original mortgage note, the interest rate should be concluded to be the same as it was in that original note, i.e. 10%. Finally, invoking the parol evidence rule the Ruths contend that the adjustment agreement, being unambiguous, cannot be expanded upon or varied by the contemporaneous loan settlement agreement.

■ While at first blush the Ruths' argument may appear to have some merit, it fails to take into consideration a special rule of contract construction which provides that:

"[I]n the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction or subject-matter are construed together in determining the contract."

*Urbanational Developers, Inc. v. Shamrock Engineering, Inc.* (1978), 175 Ind. App. 416, 372 N.E.2d 742, 754. *See also Leatherman v. Management Advisors, Inc.* (1983), Ind., 448 N.E.2d 1048, 1050; *McGann & Marsh Co., Inc. v. K & F Mfg. Co., Inc.* (1979), 179 Ind.App. 411, 385 N.E.2d 1183, 1187; 6 I.L.E. *Contracts*, Section 130 at 182 (West 1958); 17A C.J.S. *Contracts*, Section 298, at 128 (1963). We have determined that the application of this rule should not be arbitrary but rather

---

1. The Ruths also contend that the trial court's decision is not supported by sufficient evidence. As this contention is merely a reiteration of the admissibility and effect of the loan settlement agreement, our discussion under the first issue, in this regard, is dispositive.

should depend on the facts of each particular case. *Keystone Square Shopping Center Co. v. Marsh Supermarkets, Inc.* (1984), Ind.App., 459 N.E.2d 420, 424; *Urbanational Developers, Inc. supra;* 17A C.J.S. *Contracts*, Section 298, at 133 (1963). Finally, the consideration for one instrument can be found in a contemporaneous instrument. *Leatherman v. Management Advisors, Inc., supra; Goeke v. Merchants Nat. Bank and Trust Co. of Indianapolis* (1984), Ind.App., 467 N.E.2d 760.

Both the adjustment agreement and the loan settlement agreement were signed by Tolton and a representative of First Federal on May 3, 1980. Both documents refer to the same property, 5646 W. Johnson Road, LaPorte, Indiana, also known as Lot number one (1) in Pleasant Hills, as it is recorded at the LaPorte County Recorder's office. The adjustment agreement specifically sets forth monthly payments of $619.92 to satisfy the debt combined with monthly payments of $83.08 to cover taxes and insurance. Similarly, the loan settlement agreement specifically sets forth monthly payments of $619.92 to cover interest and principal payments and $83.08 to cover tax and insurance payments. The loan settlement agreement calculated the duration of the payment schedule at 28 years and 6 months and also set the annual interest rate on the debt at 13½%.

■ It is obvious that the adjustment agreement and the loan settlement agreement must be construed together to determine what the entire agreement was between Tolton and First Federal on May 3, 1980. As indicated, both documents were executed on the same day, May 3, 1980,[2]

and both documents relate to the same transaction: the adjustment of Tolton's underlying obligation to First Federal. First Federal agreed to Tolton making monthly payments toward the indebtedness, rather than having the entire amount fall due on July 10, 1980, as scheduled. In consideration for this extension of the due date, Tolton signed the loan settlement agreement increasing the annual interest rate payable on the debt from 11½% to 13½%.

■ Furthermore, James Pugh, a loan officer for First Federal, identified the loan settlement agreement and authenticated it by direct testimony that he signed the document and that he witnessed Tolton signing the document. Pugh's testimony as a co-signator or as a witness to Tolton's signing of the document is sufficient to authenticate the loan settlement agreement. *See McCormick, Evidence*, Section 219, p. 687 (Cleary ed. 1984). Pugh also testified that the loan settlement agreement was executed so as to coincide Tolton's debt and the interest rate thereon with the balance due and interest rate on the land contract, which Tolton had executed with the Ruths on the very same day. The loan settlement agreement bears this out. The loan settlement agreement has a balance due of $53,900 and an annual interest rate of 13½%, the same figures found in the land contract.

■ In conclusion, the trial court committed no error in admitting the properly identified and authenticated loan settlement agreement. As the adjustment agreement and the loan settlement agree-

---

**2.** May 3, 1980 being a Saturday, was not a regular banking day. Mr. Ruth testified that First Federal's building was opened especially for the purpose of concluding the land contract between Tolton and the Ruths. May 3, 1980 is the date the adjustment agreement and the loan settlement agreement were executed and James Pugh's testimony indicates that these documents were executed at the First Federal building. These facts support the inference that the documents were executed contemporaneously. In any event this court has indicated that the rule construing writings together can apply to documents executed at *substantially* the same time.

*Huntingburg Production Credit Ass'n. v. Griese* (1983), Ind.App., 456 N.E.2d 448. Additionally, so long as two or more instruments are part of the same transaction, different execution times will not prohibit the instruments from being construed together. 17A C.J.S. *Contracts*, Section 298, at 131 (1963). *See also Coastal Sales Co. v. Weston* (1957), 245 N.C. 621, 97 S.E.2d 267 (where instruments bore same date, it was permissible for this court to conclude that the instruments were executed contemporaneously); *Goeke v. Merchants Nat. Bank and Trust Co.* (1984), Ind.App., 467 N.E.2d 760, 768.

ment were executed at the same time and relate to the same transaction, they should have been construed together as the trial court did and such is not a violation of the parol evidence rule.

The Ruths' next contention is that the trial court erroneously determined that Tolton's discharge in bankruptcy had no effect on First Federal's lien. While the Ruths concede that the lien survives bankruptcy, they argue that the amount of the lien is fixed by the filing of the bankruptcy petition.

■ A discharge in bankruptcy has the effect of releasing the bankrupt from any personal liability upon his debts. *Echelbarger v. First National Bank of Swayzee* (1937), 211 Ind. 199, 203, 5 N.E.2d 966, 968; *Dicus v. Ripley County Bank, Osgood, Indiana* (1984), Ind.App., 471 N.E.2d 1257, 1260; 11 U.S.C.A. *Bankruptcy*, Section 524 (West 1979 & Supp.1986); 8B C.J.S. *Bankruptcy*, Section 582(1) (1963).

■ It is a well established rule of law that "a discharge in bankruptcy does not prevent a secured creditor from enforcing a valid mortgage lien on the mortgaged premises *to the extent of the lien.*" *Wilson v. Ripley County Bank* (1984), Ind. App., 462 N.E.2d 263, 266 (emphasis supplied); *Dicus v. Ripley County Bank, Osgood, Indiana, supra;* 8B C.J.S. *Bankruptcy*, Section 582(2) (1963). The only qualifications to this rule are that the lien must have been in existence before the commencement of bankruptcy proceedings and that the lien has not been avoided or dissolved by the bankruptcy court. *Everidge v. American Sec. Corp.* (1984), Ind. App., 464 N.E.2d 374, 376; *Matter of Cassi* (Bkrtcy.N.D.Ind.1982), 24 B.R. 619, 624. *See also New Union Lumber Co. v. Good* (1925), 82 Ind.App. 492, 494, 146 N.E. 584, 585; 3 *Collier on Bankruptcy* 524.01[3] (15th ed. 1979); 8B C.J.S. *Bankruptcy*, Section 582(2) (1963).

■ In the case at bar, the documents stipulated into evidence show that First Federal's lien was in existence long before Tolton filed bankruptcy in September of

1982. The mortgage was originally given to First Federal on January 10, 1979, with the last modification to its terms occurring on May 3, 1980. Further, of the materials concerning Tolton's bankruptcy which were entered into evidence, none refer to any formal avoidance procedures undertaken concerning First Federal's lien. In *Everidge v. American Sec. Corp.* this court addressed a debtor's contentions that a judgment lien on her real estate did not survive bankruptcy and that she had avoided the lien in bankruptcy court. This court concluded:

"Although Everidge asserts that she 'avoided' the lien during the bankruptcy proceedings, the record discloses no such attempt on the part of her or the trustee. The case law in this area holds that avoidance requires the filing of a formal complaint to initiate adversary proceedings. *In re Pierce* (Bkrtcy.E.D.N.C. 1983), 29 B.R. 612; *In re Andrews* (Bkrtcy.D.Del.1982), 22 B.R. 623. There is no indication that formal avoidance procedures were undertaken in this case."

464 N.E.2d at 376. Similarly, there is no indication that a formal avoidance of First Federal's lien was undertaken or accomplished in this case.

In light of these facts, we cannot perceive how the trial court could have concluded other than that First Federal's mortgage lien was not affected by Tolton's discharge in bankruptcy. Furthermore, the discharge does not prevent First Federal from enforcing the mortgage lien against the property itself "to the extent of the lien." *Wilson, supra*, 462. N.E.2d at 266. In this regard the bankruptcy court's discussion in *Matter of Cassi* is instructive:

"Plaintiff asserts that after discharge the mortgage note has no further effect upon the debtors with respect to their personal liability; but, nevertheless, the real estate mortgage, a separate contractual agreement from the note between Waterfield and the debtors, provides the basis for a lien even after discharge since the mortgage does not purport to affect

the debtor's personal liability. The Court agrees.

"Therefore the Court finds that the law is with the plaintiff and accordingly grants relief by declaring that a valid, pre-filed lien which has not been avoided during the bankruptcy proceedings is not extinguished by the discharge of the debtors *and remains enforceable in rem after the discharge* even if there is no approved reaffirmation agreement. More specifically, *the lien of Waterfield's real estate mortgage is enforceable in rem against the real estate described in the mortgage."*

24 B.R. at 624 (emphasis supplied). *See also R.L. Shirmeyer, Inc. v. Ind. Revenue Bd.* (1951), 229 Ind. 586, 594, 99 N.E.2d 847, 850 (holding that grantee-purchasers who acquired real estate subject to an existing mortgage, while not personally liable, did take "real estate charged with the payment of the debt and such *property* became the primary fund out of which said mortgage must be paid.")

The Ruths attempt to limit the effect of this rule by contending that the value of a bankrupt's debt is established on the date that the bankruptcy petition is filed. In support of this proposition the Ruths cite *In re Adams,* 2 B.R. 313 (Bkrtcy.N.E.Fla. 1980), wherein the bankruptcy court held that the filing date controlled the valuation of the creditor's security interest. In *Adams,* the creditor filed a motion in the bankruptcy court seeking a valuation of its security interest in the debtor's property so that it could file a claim for a deficiency, if any, as an unsecured creditor.

Bankruptcy Rule 3012 provides:

"The court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other person as the court may direct."

11 U.S.C.A. *Bankruptcy Rules and Official Forms,* Rule 3012. Further, when a claim is filed in the bankruptcy proceeding it is deemed allowed unless a party in inter-

est objects. 11 U.S.C.A. *Bankruptcy,* Section 502(a). There is simply no evidence in the record to suggest that a valuation of First Federal's lien was ever requested in the bankruptcy court. Hence, the *Adams* case wherein the valuation of a creditor's security interest was formally requested has no applicability to this case.

The Ruths also cite Section 502 of the bankruptcy code for the proposition that First Federal cannot receive unmatured interest on Tolton's debt. 11 U.S.C.A. *Bankruptcy,* Section 502(b)(2). The Ruths fail to recognize that Section 502(b)(2) is only applicable when an objection has been made to the secured creditor's claim. 11 U.S.C.A. *Bankruptcy,* Section 502(b). The Ruths also fail to recognize that where the mortgaged property is sufficient to pay the principle and the interest on the debt, the rule that interest stops running on the date the petition is filed is inapplicable. *U.S. v. Sampsell,* 153 F.2d 731 (9th Cir.1946). The rationale for allowing such interest is that "payment of interest accruing after the date of petition is permitted where the collateral is sufficient, for 'the collateral is security for the payment of interest as much as the payment of the principle.'" 3A *Collier on Bankruptcy,* Section 63.16, at 1862 (14th ed.) (quoting from *Littleton v. Kincaid,* 179 F.2d 848 (4th Cir.1950)). Indeed, the mortgage note involved in the present case specifically states that the mortgage is given to secure payment of the principle sum "together with interest thereon as in said note provided...." (Record at 172, Defendant's Exhibit 1). The Ruths' attempts to limit the amount of the lien from the mere fact that Tolton filed and was subsequently discharged from bankruptcy are without merit.

■ The Ruths also argue that it was incumbent upon First Federal to enforce the lien it had in the real estate at the time it filed its proof of claim in the bankruptcy court. The Ruths argue First Federal is guilty of laches and should be denied any unmatured interest as of the bankruptcy petition filing date. This argument ignores the express provision of the mortgage note

that "if a petition in bankruptcy shall be filed for or against [Tolton] then the entire indebtedness secured hereby shall at the *option* of [First Federal], become and be immediately due and payable...." (Record at 173, Defendant's Exhibit 1) (emphasis supplied). First Federal was not guilty of laches for choosing not to exercise this option.

The Ruths also argue that they were denied a fair trial when the trial court entered a finding that the Truth in Lending regulations were not applicable to Tolton's transactions of May 3, 1980. The Ruths contend that the trial judge had told counsel during a pre-trial meeting and again at the beginning of trial that he wished to bifurcate the trial, staying any consideration of damages and determining only the validity of the mortgage lien, the applicable interest rate and the effect of Tolton's bankruptcy. Support for their contention is found in the trial court's Findings and Judgment, wherein it was indicated that the parties had stipulated "that the court should only consider certain questions of law and not damages." (Record at 90). Furthermore, the trial transcript contains no mention of the Truth in Lending regulations upon which the trial court's finding could be based.

■ The Ruths, however, have failed to indicate how they may have been harmed by this finding. Even were we to assume that this finding was erroneous, the Ruths have not shown how it has any bearing on the trial court's judgment that First Federal holds a valid mortgage lien against the Ruths' real estate at an annual interest rate of 13½%. If in fact the Truth in Lending regulations do have some bearing on the validity of First Federal's mortgage lien or the applicable interest rate thereon, the Ruths have failed to present such an argument to this court. Furthermore, the Ruths appear to concede that the Truth in Lending regulations dealt with the issue of damages. Since judgment was for First Federal, which was claiming a valid mortgage lien at 13½%, the Ruths have failed to show how they may be entitled to any damages. The error, if any, of the trial court's finding in regard to the Truth in Lending regulations is harmless. *See generally Adkins v. Poparad* (1943), 222 Ind. 16, 17, 51 N.E.2d 476 (error in an instruction concerning damages deemed harmless where the verdict denied any liability).

Affirmed.

STATON, P.J., and HOFFMAN, J., concur.