**MAPLETURN UTILITIES, INC.,**
**Appellant (Defendant and**
**Counter-Plaintiff),**

v.

**FOXCLIFF SOUTH ASSOCIATES,**
**INC., Appellee (Plaintiff and**
**Counter-Defendant).**

**No. 55A04–9603–CV–107.**

Court of Appeals of Indiana.

Nov. 20, 1996.

Rehearing Denied Jan. 16, 1997.

Thomas R. Ruge, Todd A. Richardson, and Pamela H. Sherwood, Lewis & Kappes, Indianapolis, for Appellant.

Stephen A. Oliver, Boren & Oliver, Martinsville and Ronald Tedrow, Indianapolis, for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Mapleturn Utilities, Inc. appeals the summary judgment granted Foxcliff South Associates, Inc. (FSA) on FSA's complaint for breach of contract.

We reverse and remand.

### FACTS

In the early 1980's, a private utility company, Summit City Utilities, Inc., provided water and sewer services to an area north of Martinsville which we will refer to as Foxcliff North. Subsequently, an area south was platted and proposed for development by Foxcliff South, Inc., which later filed bankruptcy. Its primary lender, Merchants National Bank and Trust Co. of Indianapolis, took over the project in the name of a wholly owned subsidiary, Newcorp, Inc. As one of its actions to develop the southern subdivision, which we will refer to as Foxcliff South, Newcorp entered into an agreement with Summit and its president and sole shareholder, John Fewell. According to this 1985 agreement, Summit would provide water and sewer service to residents of Foxcliff South, and Newcorp would provide financing for the expansion of Summit's system through its parent, Merchants.

The 1985 agreement specified that Newcorp was responsible for designing the expansion and selecting contractors; further, Newcorp would "advance such amounts reasonably necessary to complete construction." (R. 457–58). In order for Newcorp "to recoup" funds loaned to Summit for its work on Foxcliff South, the agreement provided that a portion of the connection fee paid by a lot purchaser would be remitted to Newcorp. (R. 460). The agreement also required Summit to seek the necessary approval of the state regulatory authority for "the indebtedness to be incurred hereunder," (R. 461), and Summit did so. Finally, the agreement gave Newcorp "the right to assign and transfer" all of its rights thereunder to a designated successor developer. (R. 462).

During 1986, area residents experienced multiple problems with Summit, and in July the association representing Foxcliff North petitioned the regulatory authority to revoke Summit's authority and to refund certain overcharges. By 1987, numerous court proceedings were also pending against Summit and Fewell. By late summer of 1987, the various parties had negotiated a solution to the problem of how water and sewer services would be provided to the area in the future. An agreement between Summit, Fewell, Newcorp, Merchants, and the association of Foxcliff North residents ("Summit–to–Newcorp agreement") provided that Newcorp would purchase for $397,500[1] the assets of Summit and Fewell, which would be warranted and conveyed "free and clear of all liens and encumbrances except for those ... set forth" in the 1985 agreement, and the 1985 agreement was attached thereto. (R. 892). This Summit–to–Newcorp agreement specifically contemplated application to the regulatory authority for approval of a transfer of the utility's property and operating rights "to a not-for-profit corporation to be formed," (R. 897), and stated that "Newcorp is merely acting as the agent for a not-for-profit corporation to be formed for the purpose of purchasing the Property and providing sewer and water" services to the Foxcliff area. (R. 898). The agreement bears only the date of 1987 but appears to have been signed shortly before September 11, 1987.

Another agreement, dated August 7, 1987, between Merchants, Newcorp, the association of Foxcliff North residents, and an association of Foxcliff South residents ("Mapleturn agreement"), stated that a not-for-profit corporation would be formed "for the purpose of purchasing the assets" and operating rights of Summit and providing sewer and water service to Foxcliff residents. (R. 928). Merchants would make a term loan in the amount of $417,500 and provide a $100,000 credit line (which could be converted to a term loan after one year) to this corporation, and the corporation would pay $387,500 to Newcorp for its "quitclaim [to] all its right, title and interest" and $30,000 to the association of Foxcliff North in settlement of its lawsuit against the utility.

The residents of both Foxcliff areas then formed a not-for-profit corporation called Mapleturn Utilities, Inc. On September 11,

---

1. $130,000 would be paid to Newcorp itself, to satisfy debts of Summit and Fewell to the bankrupt Foxcliff South, Inc., and the agreement stated the payment constituted "partial recoupment" of Merchant's expenditures in paying the post-bankruptcy obligations of Foxcliff South, Inc. (R. 893).

1987, Mapleturn filed a petition[2] with the Indiana Utility Regulatory Commission (IURC) stating that it had been "organized for the purpose of purchasing the assets" and operating authority of Summit "and for the purpose of providing sewage disposal and water utility services" to Foxcliff residents. (R. 883). The petition said that "certain agreements for the sale and transfer of Summit City's assets and operating rights" had been entered into "[f]or the purpose of resolving various disputes between" Summit City, Fewell, Newcorp, Merchants, and the resident associations. (R. 884). These agreements (the Summit–to–Newcorp agreement, with its 1985 agreement attachment, and the Mapleturn agreement) were attached as exhibits. Continuing, the petition recited that

Newcorp, as agent of Mapleturn, will purchase all of the assets, including the CTA,[3] of Summit City and will immediately transfer the assets and CTA to Mapleturn. Thereafter, Mapleturn will render sewage disposal and water utility services in place of the services currently provided. . . .

(R. 885). The petition specified that "capitol [sic] from Merchants" would finance the purchase of assets and operating rights by Mapleturn, and a further line of credit would be provided by the bank "to make improvements to the system." *Id.* Accordingly, the petition prayed the IURC

approve the sale and transfer to Mapleturn of Summit City's assets and property; approve the sale and . . . issue a certificate of authority empowering Mapleturn to incur indebtedness for the purposes stated herein. . . .

(R. 886).

On January 6, 1988, the IURC issued an order on Mapleturn's petition "to effect a sale and transfer of [Summit's] assets and operating rights" pursuant to "settlement agreements between the parties," whereby "Newcorp, as agent of Mapleturn, proposes to purchase all of the assets, including the CTA, of [Summit] and will immediately thereafter transfer the assets and CTA to Mapleturn." (R. 556, 557). The IURC

found "Mapleturn was organized for the express purpose of purchasing the assets, including . . . operating rights currently owned by [Summit] and for the express purpose of providing sewage disposal and water utility services" to the area served by Summit and, pursuant to its later findings, "possess[ed] the financial ability to commence and maintain its proposed services." (R. 561). Accordingly, the IURC approved the sale of Summit assets to Mapleturn and authorized Mapleturn to provide water and sewer services. Further, after reviewing the terms of the Merchants loan and line of credit, the IURC found "the proposed financing to be in the public interest" and authorized same. (R. 563–4).

On February 1, 1988, Summit transferred its personal property by a bill of sale, which itemized the assets by reference to a section of the Summit–to–Newcorp agreement and warranted the property "free and clear of any and all liens, security agreements, encumbrances, claims, demands, and charges of every kind and character whatsoever." (R. 399). That same day, Summit also conveyed its real estate to Newcorp by warranty deed, "subject to easements, rights-of-way and restrictions of record." (R. 414).

On February 1, 1988, Newcorp transferred to Mapleturn by assignment the same Summit personal property transferred in the bill of sale. Newcorp then quitclaimed the Summit real estate to Mapleturn.

Over the next several years, Mapleturn operated the utility and charged the "full tariff rate" approved by the IURC when a new customer connected to its system. (R. 1045). No portion of the connection fees was remitted to Newcorp, nor did Newcorp declare Mapleturn in default under the 1985 agreement.

Newcorp developed various amenities (a clubhouse, pool and tennis courts complex and a nine-hole golf course) in the Foxcliff South subdivision, and about forty lots were connected to the system between 1988 and 1992. However, lot sales stalled, and Newcorp placed 194 lots at auction on April 15,

---

**2.** Summit joined in the petition.

**3.** Certificate of Territorial Authority.

1992. The auction materials indicated the property's aggregate retail value to be $3,352,500, or about $17,281 per lot. On the day of the auction, "Peak Management & Acquisition, Inc. and/or assigns," by Ronald Tedrow, president, agreed to purchase 184.5 lots for $250,000, or $1,355 per lot. (R. 605). The agreement provided that "any rebate due from Public Service—PSI—shall go to Purchaser." *Id.* The purchase agreement was assigned by Peak to Foxcliff South, Associates, Inc. (FSA), and the lots were conveyed from Newcorp to FSA by warranty deed on May 4, 1992.

On February 5, 1993, FSA, by its president Ronald Tedrow, entered into another purchase agreement with Newcorp whereby it would buy eighty acres of undeveloped land in Foxcliff South for $500 per acre. This agreement specified the sale would "include all of Sellers's interest in . . . any utility rebates which may be made involving the Premises." (R. 607).

Shortly after the second sale to FSA, counsel for Newcorp wrote letters to four utilities servicing Foxcliff South—including Mapleturn—stating FSA had thereby "succeeded to all rights to utility rebates to which Newcorp, Inc., as developer, may have been entitled at present or in the future." (R. 628–31). On October 22, 1993, an agreement between FSA and Newcorp stated that "to clarify and correct their agreement" as to Mapleturn, "the intent of the parties was that any and all utility rebates" were "transferred by Newcorp to" FSA. (R. 618). In December of 1993, FSA learned of the 1985 agreement between Newcorp and Summit. On January 20, 1994, counsel for Newcorp responded to an inquiry from FSA with a letter to FSA stating that Newcorp had been "asked to assign any and all rights it *might* have to utility rebates" but "[t]his assignment was given in quitclaim form, since Newcorp's business people were uncertain as to whether there were any rebates due and owing," and counsel was "unaware of the source of any

rebates being claimed" from Mapleturn. (R. 633)(emphasis in original).

Thereafter, on February 7, 1994, Ronald Tedrow, president of FSA, sent to Mapleturn a "formal notice" that it was in default under the 1985 agreement, which required Mapleturn to remit to FSA a payment of $750 from each connection fee collected "since our corporation became involved at Foxcliff." (R. 1012). On May 10, 1994, FSA filed a complaint seeking damages, declaratory relief, and attorney fees from Mapleturn for breach of contract. According to its complaint, FSA's second property purchase from Newcorp included "the rights to all utility rebates," and FSA thereby "accede[d] to all Newcorp's rights to rebates;" therefore, remittance of a portion of Mapleturn's connection fees was a "rebate"[4] owed to FSA. (R. 10). Mapleturn counterclaimed, seeking a declaration that it had no obligation or duty to pay any monies to FSA under the 1985 agreement. Mapleturn moved for summary judgment and submitted evidentiary materials. FSA submitted additional materials in response. The court heard the parties' arguments at a hearing on May 22, 1995. On September 25, 1995, the court granted summary judgment in favor of FSA.

The court concluded as a matter of law that in its petition to the IURC Mapleturn had "assumed the liabilities" of the 1985 agreement, namely to pay the developer a portion of connection fees. (R. 1091). The court further held that the bill of sale from Summit to Newcorp must be "construed together" and "to harmonize" with the Summit-to-Newcorp agreement, (R. 1092), and because that agreement included the 1985 agreement as an attachment, the more general language of the bill of sale which transferred assets "free and clear" was superseded by the specific language of the 1985 agreement imposing the liability. The result, the court concluded, was that the bill of sale transferred Summit's property "subject to the obligations under" the 1985 agreement, and Mapleturn purchased Summit's

---

**4.** A rebate has been defined as a discount or deduction from a stipulated payment, or a refund of a portion of the purchase price. *Black's Law Dictionary* 1266 (6th ed.1990). Since the provision creating this obligation specified that the payments applied toward the recoupment of monies loaned, use of the term "rebate" may be inapposite in these circumstances, and we will not use it.

asset[s], "subject to Summit's continuing obligations under" the 1985 agreement. (R. 1095). The court also concluded as a matter of law that (1) the 1985 agreement "contained covenants that touched and concerned the land" (R. 1096), which bound Mapleturn as Summit's successor, and (2) the 1985 agreement "created a lien against Summit's real estate which was perfected" by the recording of the 1985 agreement,[5] with Mapleturn acquiring the Summit real estate "subject to the valid perfected lien created." (R. 1097). Finally, because the 1985 agreement provided for expenses including attorney fees incurred after written notice of default, the court held Mapleturn "obligated to FSA for reasonable attorneys fees." (R. 1096).

## DECISION

■ Summary judgment requires that there be no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Seymour Mfg. v. Commercial Union Ins.*, 665 N.E.2d 891, 892 (Ind.1996). Generally, the construction or legal effect of a contract is a question of law to be determined by the court. *R.R.S. II Enterprises, Inc. v. Regency Associates*, 646 N.E.2d 56, 60, (Ind.Ct.App.1995), *trans. denied.* Our task is to determine whether the trial court correctly applied the law. *L.E. Services v. State Lottery Comm'n*, 646 N.E.2d 334, 339 (Ind.Ct.App.1995), *trans. denied.* Where the trial court enters findings of fact and conclusions of law when ruling upon a motion for summary judgment, such findings and conclusions illuminate the trial court's rationale; however, they have no other purpose. *Dague v. Fort Wayne Newspapers, Inc.*, 647 N.E.2d 1138, 1140 (Ind.Ct.App.1995), *trans. denied.* We do not rely upon the trial court's findings and conclusions but rather base our decision upon the properly designated evidentiary material before the court. *Id.*

■ Mapleturn claims the court's holding that it had assumed Summit's liabilities under the 1985 agreement is erroneous because (1) there was no assignment or delegation to

Mapleturn of Summit's financial obligations under the 1985 agreement; (2) Summit's financial obligations under the 1985 agreement were not included in the assets purchased by Mapleturn; and (3) Summit's contractual liability to Newcorp was not an encumbrance on its real estate and cannot have survived the quitclaim deed. Accordingly, Mapleturn argues, the evidence before the court reveals that Mapleturn was a purchaser of assets only and never agreed to assume any contractual debts or liabilities of Summit. We agree.

The court's order and both parties' briefs cite to *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1233 (Ind.1994), wherein our supreme court distinguished the sale of a corporation's stock from a corporate sale of assets and provided the following guidance regarding a sale of assets:

> [W]here one corporation purchases the assets of another, the buyer does not assume the debts and liabilities of the seller. Generally recognized exceptions to this rule include (1) an implied or express agreement to assume the obligation; (2) a fraudulent sale of assets done for the purpose of escaping liability; (3) a purchase that is a de facto consolidation or merger; or (4) instances where the purchase is a mere continuation of the seller.

*Id.* (citations omitted). According to the trial court, Mapleturn's petition to the IURC "in attaching and referring to both" the Summit-to-Newcorp agreement and the 1985 agreement "renders the conclusion that Mapleturn assumed the liabilities under the [1985 agreement] inescapable." (R. 1091). However, the petition itself nowhere refers to the 1985 agreement. The 1985 agreement was simply an attachment to the Summit-to-Newcorp agreement, which is referred to in the petition.

■ The trial court's order and FSA's brief also cite to various authorities for the proposition that two or more instruments that are part of the same transaction are to be construed together and toward a construc-

5. The agreement was recorded with the Morgan County Recorder four days after its execution in 1985.

tion that harmonizes its provisions. According to FSA, when the Summit–to–Newcorp agreement, saying the liability would accompany the assets purchased by Newcorp, was construed with the Mapleturn agreement, saying Mapleturn would purchase only the assets from Newcorp, the "indisputable intent of the parties" is a sale of Summit's assets to Mapleturn subject to the terms of the 1985 agreement. FSA's Brief at 17. We cannot agree. As just noted, the former agreement contemplates the transfer of the liability, and the latter does not. The intention of parties to a contract is to be determined from the four corners of the document. *McCae Management v. Merchants Nat'l Bank & Trust Co.*, 553 N.E.2d 884, 887 (Ind.Ct.App.1990), *trans. denied.* Moreover, the court's authority, *McCae, supra,* and FSA's additional citation of *Ruth v. First Federal Savings & Loan Ass'n of LaPorte County,* 492 N.E.2d 1105 (Ind.Ct.App.1986), for construing documents together are distinguished by facts wherein the identical parties signed these different documents. Here, Summit, Fewell, Merchants, Newcorp and the Foxcliff North association signed the Summit–to–Newcorp agreement, and Merchants, Newcorp, and the two Foxcliff associations signed the Mapleturn agreement. Further, we do not find that Newcorp's capacity as agent for Mapleturn in negotiating the purchase from Summit affects the analysis here. First, according to the record, Newcorp was not only a sophisticated business entity but also operated in concert with a major bank. Thus, we presume that Newcorp intended to negotiate and execute exactly the instruments produced. Second, all references to Newcorp as agent in this instance indicate the agency was for the purpose of the transfer of Summit assets to Mapleturn. This is exactly what the two documents accomplish.

FSA's argument that "the IURC approved the Mapleturn agreement subject to Mapleturn's agreement to assume Summit's obligations under the" 1985 agreement, FSA's Brief at 26, suffers the same structural infirmity as discussed above insofar as the effect of having attached the 1985 agreement to the Newcorp–to–Summit agreement with the IURC petition. Moreover, the IURC approval, as described in FACTS, nowhere mentions a liability of Mapleturn for a portion of its authorized connection fees or an indebtedness other than the new Merchants loans discussed in its order. Finally, FSA emphasizes the wording whereby IURC approved Summit's "sale of its assets to Mapleturn under the terms and conditions of the agreements negotiated by the parties." (R. 565). The petition to the IURC said certain "Agreements" had been reached by "the parties," enumerated as Summit, the Foxcliff North association, the Foxcliff South association, Newcorp, Merchants, and Fewell. (R. 884). The petition sought approval of the "terms and conditions set forth in the Agreements." (R. 886). Neither of the Foxcliff associations nor Merchants were parties to the 1985 agreement. Thus the petition sought and the IURC order granted approval only of the Agreements of the enumerated parties: the Summit–to–Newcorp agreement and the Mapleturn agreement. That in the first step of the transaction Newcorp would acquire not only Summit's assets but also the partial connection fee liability does not affect the fact that, according to the Mapleturn agreement, in the second step Newcorp would transfer only Summit's assets to Mapleturn.

◼ FSA claims when the corporate warranty deed transferred Summit's real property to Newcorp subject to restrictions of record, and Newcorp quitclaimed "that same title" to Mapleturn, the 1985 agreement was a restriction of record and constituted a covenant running with the land. FSA's Brief at 24. The trial court agreed and cited *Noblesville Redevelopment v. Noblesville Associates,* 646 N.E.2d 364, 370 (Ind.Ct.App.1995), as does FSA in its brief, for the proposition that an act either increasing the value of the land to the grantee or decreasing or encumbering the value of the land to the grantor is a covenant which touches and concerns the land. *Noblesville*'s application here misses a necessary first step. We stated that the "concept[ ] of touch and concern" for a running covenant requires the covenant's "relation to the interest or estate granted, and the act to be done must concern the interest created or conveyed." *Id.* at 370. The 1985

agreement granted Newcorp an easement over the Summit real estate for construction and maintenance purposes. The "act to be done" was remittance of certain payments to be applied against expenditures to install utility services on non-Summit property. While the considerable improvements to Foxcliff South lots indeed increased their value, the estate granted—namely, the easement over Summit property—does not concern the Foxcliff South properties. Therefore, the commitment to make payments for connection of Foxcliff South lots cannot be a covenant running with the Summit real estate.

 Finally, FSA asserts that the 1985 agreement "specifically granted Newcorp a continuing security interest in all existing and future" connection payments and directs our attention to the fact that the 1985 agreement was recorded. FSA's Brief at 25. As indicated in FACTS, the trial court concluded the agreement created a lien against the Summit real estate which was perfected by recording. However, referring to the 1985 agreement we find it provides that upon a failure by Summit to perform "after twenty (20) days' written notice and demand," Newcorp "shall have the right ... to constitute the amount of such costs and interest to be a lien on the Summit City Real Estate, notice of which may be recorded by Newcorp with the Recorder of Morgan County, Indiana." (R. 488, 489). Inasmuch as the 1985 agreement was signed on February 15, 1985, (R. 479), and recorded on February 19, 1985, (R. 1003), the evidence of record does not indicate that the condition precedent to the creation of a lien was met, and, therefore, that the recorded document constituted a perfected lien.

FSA failed to present any evidence to the court that Mapleturn agreed to assume the obligation contained in the 1985 agreement to remit a portion of connection fees for Foxcliff South properties to which utility service was extended under the 1985 agreement. Mapleturn purchased the assets of Summit only, and the assets were transferred by Newcorp free and clear of all encumbrances and liens.

The 1985 agreement did not create a covenant running with the land on the Summit real estate. No evidence of a perfected security lien was before the court.

 When the trial court has incorrectly applied the law to undisputed facts upon a summary judgment motion, we will reverse its ruling on appeal. *Nobles v. Cartwright*, 659 N.E.2d 1064, 1077 (Ind.Ct.App.1995). The trial court improperly applied the law in granting FSA's motion; consequently, the decision of the trial court is reversed. *See, Link v. Breen*, 649 N.E.2d 126, 129 (Ind.Ct. App.1995), *trans. denied.* Further, the trial court erred in denying Mapleturn's motion for summary judgment. Mapleturn is entitled to judgment as a matter of law, and we remand with instructions for the trial court to enter summary judgment in favor of Mapleturn.[6]

RILEY and BARTEAU, JJ., concur.

---

6. FSA has also filed a petition for attorney fees under Ind. Appellate Rule 15(G), claiming Mapleturn's appeal herein to be frivolous. Inasmuch as we have reversed the order of the trial court, Mapleturn's appeal cannot be found frivolous. The petition is denied.