**LAFAYETTE PRODUCTION CREDIT ASSOCIATION, Plaintiff,**

v.

**WILSON FOODS CORPORATION, Defendant.**

**No. H 82-603.**

United States District Court,
N.D. Indiana,
Hammond Division.

Oct. 14, 1987.

curity for a livestock production loan by an agricultural lender, Lafayette Production Credit Association (PCA). The total loan exceeded $1.8 million. The farmer met with PCA over a two day period to discuss the terms of renewing his annual production loan. During these meetings the farmer signed several documents relating to the loan, including a loan closing letter which stated that, as hogs were sold, payment was to be received in the form of checks payable jointly to PCA and the farmer. A joint security agreement/financing statement was filed in accordance with Indiana's Uniform Commercial Code. During an eighteen month period shortly after the loan was renewed, the farmer sold over 12,000 head of hogs to a particular meat packer, Wilson Foods Corporation (Wilson). The farmer obtained payments from Wilson which ignored the joint check requirement provided by the loan agreement. These payments totaled over $1.4 million. During the period of sales to Wilson, PCA made various inquiries about the farmer's hog sales and was frequently advised by the farmer that he was pursuing refinancing for the entire loan. PCA received no proceeds from these sales yet delayed taking any legal action against the farmer. Ultimately the farmer declared bankruptcy.

Following the Nelson bankruptcy PCA brought action against Wilson for conversion. A partial summary judgment was granted in favor of Wilson with regard to PCA's claim for civil damages based on criminal conversion. Later a bench trial was held at which PCA sought compensatory, treble and punitive damages as well as costs, attorney fees and prejudgment interest. This opinion contains findings of fact and conclusions of law as required by FED. R.CIV.P. 52.[3]

Steven R. Pennell, James V. McGlone, Stuart & Branigin, Lafayette, Ind., for plaintiff.

James T. Malysiak, Freeman, Rothe, Freeman & Salzman, Chicago, Ill., for defendant.

## AMENDED JUDGMENT ORDER [1]

KANNE, Circuit Judge.[2]

This is a case about conversion—a meat packer's purchase and use of hogs which were subject to a security interest. Hogs raised by an Indiana farmer provided se-

1. In its Judgment Order entered October 8, 1987, the court addressed all issues raised by the plaintiff except one, the claim of treble damages for criminal mischief. By this Amended Judgment Order we now decide all claims at issue.

2. The Honorable Michael S. Kanne, Judge for the United States Court of Appeals, Seventh Circuit, is sitting by designation.

3. The final decision in this case was substantially delayed through no fault of counsel. The judicial appointment process, illness and a change of court staff contributed to the unfortunate delay in the issuance of this order.

Based on the facts and Indiana law as discussed below, the court finds: (1) that the security agreement filed by PCA incorporated the conditions of the loan closing letter; (2) that Wilson's conduct constituted conversion; (3) the defenses of authorization, estoppel, and avoidable consequences asserted by Wilson are inapplicable; (4) that Wilson is liable for compensatory damages and prejudgment interest; and, (5) that Wilson is not liable for punitive or treble damages or attorney fees.

## I. STATEMENT OF FACTS

Howard and Beverly Nelson operated a large-scale hog farm near Rensselaer, Indiana. Beginning in 1964 the Nelsons annually received financing from plaintiff, PCA, by renewing their application for operating funds. Each year PCA would renew the loan and take a security interest in Nelson Farm hogs. The Nelsons would raise and sell hogs, using the proceeds to cover operating expenses and to repay the outstanding PCA debt.

At the end of the 1970's, like other farmers with heavy debt service, the Nelsons began to experience cash flow difficulties. PCA conditioned the 1980 loan on several provisions, including a requirement that all hog sales be paid by checks issued jointly to PCA and Nelson Farms, Inc. PCA instituted this joint check requirement in an effort to gain timely repayment of the loan. The joint check requirement, along with seven other conditions, was encompassed in a loan closing letter signed by both parties and dated February 12, 1980.

With the PCA financing terms completed, a valid security agreement on the hogs was executed. This agreement was then perfected by filing a joint security agreement/financing statement with the Recorder of Jasper County on February 21, 1980, and with the Indiana Secretary of State on February 22, 1980.

PCA advanced a total of $1,817,784.90 to the Nelsons pursuant to their agreement.

Initially, the Nelsons complied with the agreement and had joint checks issued for all hog sales, with part of the proceeds going to PCA. However, times were tough and the Nelsons needed cash. They began violating the joint check requirement by selling hogs without having joint checks issued and without distributing any of the funds to PCA.

As early as June 1980, PCA suspected that Nelson was ignoring the joint check provision. Lawrence Dill, PCA's Rensselaer manager, decided to notify Nelson's customary buyers. Dill wrote to Purchasers Market Association (PMA) and Heinhold Hog Market (Heinhold), on June 27, 1980, advising them of PCA's security interest in the Nelson Farms' hogs as well as of the joint check requirement. Nelson briefly continued sales to his local buyers and PCA again received joint checks from PMA for a few weeks. However, with his local customary buyers apprised by PCA of the lien on the Nelson Farms' hogs, Howard Nelson was stymied in his efforts to sell his hogs and keep the entire proceeds for himself.

Thus, after July 16, 1980, Nelson discontinued selling hogs to PMA. Nor were any sales made to Heinhold during this period.

In the meantime, Nelson's twenty-one year old son-in-law, Jim Misch, sold hogs he owned personally to defendant Wilson at its Monon, Indiana hog buying station. Misch received a single check issued in his name, covering both the price of the hogs and payment for delivery. Although Misch produced very few hogs for sale himself, his contact with Wilson's hog buying station prompted the scheme employed by Nelson.

On July 23, 1980, Misch appeared at Wilson's hog buying station in Monon with a load of Nelson Farm hogs. In contrast to the method of payment in the initial Misch hog sale, Wilson issued two checks per transaction, one made payable solely to Howard Nelson and a smaller check made payable to Misch for the trucking of the hogs. Seven separate sales were made between July 23 and August 18, 1980, with Wilson paying a total of $56,766.37 in Nelson's name. (See Plaintiff's Exhibit 143).

During the time of these sales, PCA suspected that Nelson was violating the joint

check provision. However, Nelson informed various PCA representatives that he was seeking refinancing from other lenders to pay them off, and PCA continued to forego any legal action against the Nelsons.

On September 5, 1980, Mr. Dill wrote Wilson informing them of the PCA lien and joint check requirement for Nelson Farm hogs. Although there are factual disputes regarding the exact details of Wilson's internal response after receiving PCA's letter, it is clear that Wilson's legal department was consulted regarding the situation.

On September 8, Mr. Gilmore, a hog buyer employed by Wilson, was instructed by his supervisor, Bill Peterson, that he should refuse to purchase hogs *only* if he "knew with certaintude" that the person selling them was not the actual owner. Peterson told Gilmore to go ahead and purchase hogs if he was "merely suspicious" as to their actual ownership.

From September 5, 1980, to December 31, 1981, Wilson purchased Nelson Farms' hogs with a fair market value of $1,438,-402.64. (See Plaintiff's Exhibit 143). Each check was endorsed by either Howard or Beverly Nelson. From July, 1980 through December, 1981 Nelson sold between 12,-000 and 13,000 head of hogs to Wilson. PCA received none of the proceeds from any of these sales to Wilson.

The Nelsons were unable to find a new lender willing to refinance their PCA loan. (Although they apparently made efforts throughout the United States and abroad). With their unmanageable debt to PCA and numerous suppliers, a decline in the market price of hogs, diseased pigs, and plain mismanagement, the Nelsons filed bankruptcy in December of 1981.

PCA then filed a claim against Wilson for tortious conversion in Indiana state court. The case was subsequently removed to federal court and this court properly has jurisdiction pursuant to 28 U.S.C. § 1332.[4]

## II. THE ISSUES

PCA alleges that Wilson is liable for conversion as a result of purchasing hogs in which PCA had a valid security interest.

Wilson contends that the joint check agreement was not a part of the security agreement, and asserts several defenses to PCA's charge of conversion. Wilson claims: (1) that PCA authorized the hog sales by not preventing them even though PCA was aware the sales were occurring; (2) that PCA is estopped from recovery because of misrepresentations made by PCA; and (3) the doctrine of avoidable consequences operates to bar PCA's recovery.

## III. CONSTRUCTION OF THE SECURITY AGREEMENT

The primary issue is whether Wilson is liable for conversion of hogs as alleged by PCA. However, in order for Wilson to be liable for conversion, PCA must establish an ownership interest in the hogs. PCA bases its right to possession of the hogs on the security agreement/financing statement it entered into with Howard and Beverly Nelson. PCA asserts that the parties agreed that PCA would loan money to the Nelsons in exchange for compliance with certain conditions. The condition crucial to the outcome of this case was contained in a loan closing letter, signed by the parties, which stated:

No. 4 All hogs sold will be sold with understanding checks shall be made payable to Lafayette Production Credit Association and Nelson Farms, Inc.

PCA argues that the Indiana Uniform Commercial Code, and rules regarding the construction of contracts, mandate that all of the documents relating to the loan should be construed together. Thus, PCA would include not only the financing statement and security agreement, but also the loan agreement and loan closing letter

4. PCA is an agricultural lender headquartered in Louisville, Kentucky and Wilson is an Oklahoma corporation with offices in several cities in the midwest, including an Indiana packing plant in Logansport and a hog buying station in Monon. The amount in controversy exceeds $10,000.

as the "agreement" between PCA and the Nelsons.

Indiana's Uniform Commercial Code requires both attachment and filing for the perfection of a valid security interest. For attachment to occur, the debtor must have rights in the collateral, there must be a valid security agreement and value must be given. I.C. 26–1–9–204. Filing a valid financing statement completes the process and perfects the security interest.

The Nelsons and PCA entered into a security agreement on February 11, 1980, PCA's loan to Nelson constitutes value given and no one challenges the Nelsons' rights in the hogs. A joint security agreement/financing statement was filed with both the County Recorder's Office (where the debtor and the collateral were located) and the Indiana Secretary of State's Office. PCA's security interest was thus perfected pursuant to I.C. 26–1–9–302.

The Nelsons met with loan officers from PCA on February 11 and 12, 1980. During those two days, several documents were signed by one or both parties, including the security agreement, financing statement, loan agreement and the controversial loan closing letter containing the joint check condition.

Wilson does not dispute that PCA had a valid security interest in the Nelson Farm hogs. However, they dispute whether the February 12, 1980 loan closing letter signed by both parties was incorporated into the security agreement between the parties and whether it binds Wilson.

The term "security agreement" is defined in I.C. 26–1–9–105(1)(h) as "an agreement which creates or provides for a security interest."

I.C. 26–1–1–201(3) defines "agreement" as "the *bargain of the parties in fact* as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." (Emphasis added.)

PCA contends that the "bargain of the parties in fact" included the language of the February 12 loan closing letter, with the joint check provision. They also assert that the parties' course of performance indicates the loan closing letter was part of the total loan package.

Wilson vigorously challenges this contention, asserting that only the security agreement itself, not the total loan agreement, applies to third party purchasers under I.C. 26–1–9–201. Wilson cites *In the Matter of Martin Grinding & Machine Works, Inc.*, 793 F.2d 592 (7th Cir., 1976), in which (now senior) Judge Jesse Eschbach applied Illinois law and wrote that:

> Since the security agreement is unambiguous on its face, neither the financing statement, nor the other loan documents can expand the bank's security interest beyond that stated in the security agreement.

PCA responds that *Martin* is inapplicable in this case. The precise issue in *Martin* was whether the bank held a security interest in the debtor's inventory and accounts receivable. The court was asked to determine the scope of the collateral secured by the security interest. Here, on the other hand, the question does not involve determining the collateral's scope, but rather, it involves determining the terms of the security agreement itself. PCA argues that the loan closing letter must be construed together with the financing statement/security agreement to determine the "bargain of the parties in fact" under I.C. 26–1–1–201(3). To support this contention, they refer to the language of the loan application referencing the loan closing letter which states: "See agreement dated 2–12–80."

PCA urges this court to find that all of the documents signed by the parties over the two-day period manifest their bargain in fact. Arguing that *Martin* does not address the issue of whether documents executed contemporaneously and relating to the same subject matter are to be construed together, PCA cites *Ruth v. First Federal Savings and Loan Association of LaPorte*, 492 N.E.2d 1105 (Ind.App., 1986). In *Ruth*, the plaintiffs argued that an unambiguous adjustment agreement could not be varied by a loan settlement agree-

ment. The Indiana Court of Appeals disagreed, holding that:

> It is obvious that the adjustment agreement and the loan settlement agreement must be construed together to determine what the entire agreement was between Tolton and First Federal on May 3, 1980. As indicated, both documents were executed on the same day, May 3, 1980, and both documents relate to the same transaction; the adjustment of Tolton's obligation to First Federal.
>
> . . . .
>
> As the adjustment agreement and the loan settlement agreement were executed at the same time and relate to the same transaction, they should have been construed together. . . .

*Id.* at 1108–1109.

Citing *Huntingburg Production Credit Ass'n v. Griese,* 456 N.E.2d 448 (Ind.App., 1983), the *Ruth* court stated:

> In any event this court indicated that the rule construing writings together can apply to documents executed at *substantially* the same time. Additionally, so long as two or more instruments are part of the same transaction, different execution times will not prohibit the instruments from being construed together.

*Ruth,* 492 N.E.2d at 1108, fn. 2.

Thus, the security agreement is not limited to any one document, but includes documents indicating the bargain of the parties in fact. In *Wambach v. Randall,* 484 F.2d 572 (7th Cir., 1973), the district court considered collateral notes and other documents relating to a loan transaction in determining what constituted a written security agreement. The Seventh Circuit affirmed the district court's reliance on the UCC's definition of agreement "as found" in language or by implication from the circumstances and affirmed the trial court's decision to look "to all of the documents constituting the transaction." *Wambach,* 484 F.2d at 574–576.

The court is constrained to agree that writings which are executed at substantially the same time and relate to the same subject matter should be construed together and considered as one instrument to determine the bargain of the parties. Thus, adhering to the reasoning set forth in *Ruth,* the court finds that *all* of the documents signed by the Nelsons and PCA, including the loan closing letter, should be construed together to represent the parties' bargain. *Martin* is distinguished since it concerns an expansion of the collateral within the security agreement, not a determination of what documents comprise the agreement. Here there was clearly no attempt to expand the collateral. Moreover, *Martin* applies Illinois rather than Indiana law.

Alternatively, I.C. 26–1–1–201(3) provides that not only the language but the conduct and course of performance between the parties are indications of their agreement. Evidence during trial demonstrated that both PCA and the Nelsons intended the terms of the loan closing letter to be binding upon both parties.

The Nelsons' course of performance demonstrates that they acknowledged their obligation to comply with the joint check provision. They initially had checks made payable jointly to themselves and PCA. The very fact that the Nelsons resorted to the subterfuge of selling hogs under Jim Misch's name in order to circumvent the issuance of joint checks is some evidence of their belief that it was a binding part of their agreement with PCA. Wilson claims that the loan closing letter was merely a warning to Nelson, outlining what he was expected to do to keep his loan without detailing any specific penalty for failure to comply. If that were true, and the letter was merely a nonbinding warning, there was no reason why the Nelsons discontinued selling hogs openly to Wilson.

PCA's course of performance also evinces an intention that the joint check provision be considered part of the total bargain. PCA notified the regular buyers of Nelson Farms' hogs, in writing, of the joint check provision. When Dill complained that Nelson was not fulfilling the agreement, Nelson Farms resumed compliance and from April 4–July 16, 1980, they did not sell hogs without the issuance of joint checks. Dill's June, 1980 letters to Heinhold and PMA,

and September, 1980 letter to Wilson, notifying them of the joint check requirement is further evidence that PCA intended the joint check term to be binding.

The court finds that the security agreement incorporated the loan closing letter. The explicit reference to the letter in the language of the loan agreement, and the conduct of the Nelsons and PCA representatives indicates that each party thought the joint check requirement was an essential provision of their contractual agreement.

## IV. CONVERSION

Having determined PCA's ownership interest in the hogs, the court next addresses the conversion issue.

■ Conversion is a tort involving the appropriation of the personal property of another to the tortfeasor's own use and benefit, in exclusion and defiance of the owner's rights and under an inconsistent claim of title. *Plymouth Fertilizer Co., Inc. v. Balmer*, 488 N.E.2d 1129, 1140 (Ind. App.1986), citing *Howard Dodge & Sons, Inc. v. Finn*, 391 N.E.2d 638, 640 (Ind.App., 1979). The fact that a tortfeasor may have acted in good faith in assuming dominion over the owner's property is immaterial. *Howard Dodge, supra,* 391 N.E.2d at 641.

PCA's claim of conversion is supported by I.C. 26–1–9–307(1), which, in 1980, at the time of the alleged conversion, provided that:

[A] buyer in the ordinary course of business *other than a person buying farm products from a person engaged in farming operations* takes free of a security interest created by the seller— even if it is perfected and he had knowledge. (Emphasis added.)

Thus, the governing Indiana statute gave PCA priority over Wilson. After the time period involved in this case, the Indiana legislature amended the statute, and set forth a detailed procedural guideline for farm lenders (such as PCA) to follow to retain priority status over purchasers of farm products (such as Wilson). In pertinent part, I.C. 26–1–9–307 now provides:

(1) A buyer in ordinary course of business (IC 26–1–1–201(9)) takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence. The following apply whenever a person is buying farm products from a person engaged in farming operations who has created a security interest on the farm products:

(a) A person buying farm products from a person engaged in farming operations is not protected by this subsection if he has received prior written notice of the security interest. 'Written notice' means an original financing statement or a carbon, photographic, or other reproduction of an original that is effective under IC 26–1–9–402, or a notice on a form prescribed by the secretary of state or a carbon, photographic, or other reproduction of the form that contains the following:

(i) The full name and address of the debtor.

(ii) The full name and address of the secured party.

(iii) A description of the collateral.

(iv) The date and location of the filing of the security interest.

(v) The date and signature of the secured party if required by IC 26–1–9–402(2).

(vi) The date and signature of the debtor except as provided in IC 26–1–9–402(2)(e).

A written notice expires eighteen (18) months after the date the secured party signed the notice or at the time the debt that appears on the notice is satisfied, whichever occurs first. Notice must be received before a buyer of farm products has made full payment to the person engaged in farming operations for the farm products if the notice is to be considered 'prior written notice.'

(b) A secured party must, within fifteen (15) days of the satisfaction of the debt, inform in writing each potential buyer listed by the debtor whenever a debt has been satisfied and written

notice, as required by subdivision (a), had been previously sent to that buyer. (c) A debtor engaged in farming operations who has created a security interest in farm products must provide the secured party with a written list of potential buyers of the farm products at the time the debt is incurred if such a list is requested by the secured party. The debtor may not sell farm products to a buyer who does not appear on the list (if the list is requested by the secured party) unless the secured party has given prior written permission to the debtor to sell to someone who does not appear on the list, or the debtor satisfies the debt for that secured party on the farm products he sells within fifteen (15) days of the date of sale. A debtor who knowingly or intentionally sells to a buyer who does not appear on the list (if the list is requested by the secured party) and who does not meet one (1) of the above exceptions, commits a class C misdemeanor. A secured party commits a class C infraction if he knowingly or intentionally gives false or misleading information on the notice required by subdivision (a) or he fails within fifteen (15) days of satisfaction of the debt to notify purchasers to whom a written notice had been previously sent under subdivision (a) of the satisfaction of the debt.
(d) A purchaser of farm products buying from a person engaged in farming operations must issue a check for payment jointly to the debtor and those secured parties from whom he has received prior written notice of a security interest as provided for in subdivision (a). A purchaser who fails to issue a jointly payable check as required by this subdivision is not protected by this subdivision. A purchaser of farm products (on which there is a perfected security interest) buying from a person engaged in farming operations who withholds all or part of the proceeds of the sale from the seller, in order to satisfy a prior debt ('prior debt' does not include the costs of marketing the farm product or the cost of transporting the farm product to the market) owned by the seller to the buyer, commits a class C infraction.

. . . .

Today, under the amended statute, disposition of this case would be relatively straightforward. Nelson would now be required to give PCA a list of potential hog buyers and, as a condition of maintaining their priority status, PCA would then have the burden of notifying these buyers, in writing, of PCA's interest in the hogs. While the new law imposes more of a duty on the farm lender to police the debtor, it would facilitate the disposition of cases such as this.

The revised statute, however, reinforces one of the major underlying purposes of Indiana's Uniform Commercial Code in that it provides for a method of notifying third parties of a creditor's interest in a debtor's property, while protecting the creditor's priority status. The purpose of filing a financing statement (whether before or after the statutory amendment) is to give notice to the world that the secured party has a security interest in the collateral.

The court concludes that Wilson converted PCA's interest in the Nelson Farm hogs, in violation of Indiana law.

## V. DEFENSE OF AUTHORIZATION

Having determined that Wilson converted PCA's interest in the Nelson Farm hogs, the court must examine the various defenses asserted by Wilson.

Wilson maintains that PCA impliedly authorized the hog sales by failing to prevent Nelson and Wilson from diverting the proceeds from the hog sales, and by failing to report Nelson Farms to the Federal Intermediate Credit Bank in a timely manner. Wilson argues that any liability for tortious conversion on its part is negated by PCA's authorization of the sales.

Generally, "an act which would otherwise constitute a conversion may be precluded from having that effect by the plaintiff's consent to the act, either express or

implied." 18 AM.JUR.2d *Conversion* § 93, p. 210.

Wilson points to testimony from Mr. Dill that PCA knew that Nelson sold them hogs, and that "PCA's knowing tolerance of repeated security agreement violations constitutes consent to the sales."

PCA, on the other hand refutes the assertion that it gave express or implied authorization to sales not complying with the joint check requirement.

PCA points to letters it wrote PMA and Heinhold, former purchasers of Nelson Farm hogs, advising them of the joint check requirement. When PCA learned Howard Nelson was selling hogs to Wilson, Mr. Dill notified Mr. Gilmore that PCA expected all checks for Nelson Farms' hogs to be issued jointly to Nelson and PCA. Mr. Schrum, also from PCA, reiterated this to Gilmore on October 16, 1980.

Authorization, like waiver, requires both knowledge of a right and an intentional relinquishment of a known right, and an election by one to forego some advantage upon which he might have insisted. *Lafayette Car Wash, Inc. v. Boes*, 258 Ind. 498, 282 N.E.2d 837, 839 (1972). Mere silence, acquiescence or inactivity is not a waiver or authorization unless there was a duty to speak or act. *Given v. Cappas*, 486 N.E.2d 583, 592 (Ind.App., 1985); *American National Bank & Trust Co. v. St. Joseph Valley Bank*, 391 N.E.2d 685, 687 (Ind. App., 1979). The burden of proof lies on the party asserting the waiver. *Id.* Wilson has not established that PCA breached a duty to speak. As in *National Acceptance Co. of America v. Virginia Capital Bank*, 491 F.Supp. 1269 (E.D.Va.1980), a secured creditor does not owe any duty to those having subordinate interests to proceed to enforce its remedies.

PCA further asserts that neither the parties to the security agreement nor Wilson believed that PCA intended to authorize the sales. They argue that there would have been no reason for Nelson Farms and Wilson to have engaged in the charade of selling the hogs under assumed names if either believed that the sales without joint checks had been authorized.

The joint check requirement was a condition to all Nelson hog sales. PCA denies that it authorized any sales in violation of that provision. Indiana law mandates that "where conditions to a sale are imposed by the secured party, a sale by the debtor in violation of the conditions is unauthorized, and the security interest continues." *Anon, Inc. v. Farmers Production Credit Ass'n*, 446 N.E.2d 656 (Ind.App.1983).

The court finds that PCA did not authorize any hog sales free of the joint check provisions of the security agreement.

## VI. ESTOPPEL

▪ Wilson contends that PCA is estopped from claiming conversion because PCA allegedly made misrepresentations and omissions which induced Gilmore to continue to buy hogs from "Jim Misch".

PCA correctly argues that the doctrine of estoppel is inapplicable to the case at bar.

In *State ex rel Crooke v. Lugar*, 171 Ind.App. 60, 354 N.E.2d 755, 766 (1976), the court set forth the following five elements of the equitable estoppel doctrine: 1) the party sought to be estopped must have made a representation or concealment of material facts; 2) the party sought to be estopped must have made the representation or concealment with knowledge of the facts surrounding the situation; 3) the party seeking the estoppel must have been ignorant of the facts; 4) the party sought to be estopped must have intended that the party seeking the estoppel should act upon the misrepresentation or concealment; and 5) the party seeking the estoppel must have been induced to act upon it.

The court finds that Wilson has not met its burden of proof regarding these five elements. Estoppel presupposes that Wilson was ignorant of the true state of facts. However, PCA provided Wilson with constructive notice of its security interest in the Nelson hogs in February, 1980 when it filed a financing statement. Both Howard Nelson and Jim Misch testified that Gilmore was advised of the fact that the hogs were owned by the Nelsons. Further, Wil-

son had actual notice of both the security interest and the joint check requirement on September 5, 1980, when PCA explicitly sent Wilson written notice, outlining its interest in Nelson Farm hogs. After February, 1980, Wilson should have been aware of PCA's rights to the hogs. After September, 1980 they clearly had actual notice of PCA's rights in the Nelson hogs.

Wilson was not an innocent third party purchaser such as those the drafters of the U.C.C. sought to protect. Wilson routinely risked liability for conversion by habitually failing to make *any* inquiries to determine whether hogs they purchased were encumbered. Wilson sent an independent trucker to Nelson Farms to pick up a shipment of hogs, Wilson representatives visited Nelson Farms and regularly discussed specific terms of hog sales with Howard Nelson. Both Nelson and Misch testified that Mr. Gilmore was informed that the hogs belonged to Nelson. Thus, elements three and five of the *Lugar* test are not present in this case.

Wilson was not ignorant of the fact that PCA had a security interest in the Nelson Farm hogs. They could not be willfully blind. Trial testimony established that Gilmore was suspicious that Misch's hogs were actually Nelson's hogs. He checked with his superiors for instructions as to how to proceed and was given the "ostrich" instruction to buy hogs from Misch even though he was admittedly suspicious that Nelson and Misch were violating the joint check agreement with PCA—as long as he did not know with "certaintude" that Misch was not the true owner. "A person who ignores highly suspicious circumstances cannot successfully contend that he was misled by the representations of another. If the party conducts himself with careless indifference to means of information readily at hand, or ignores highly suspicious circumstances, he may not invoke the doctrine of estoppel." *Barnd v. Borst*, 431 N.E.2d 161, 168 (Ind.App., 1982). Wilson's failure to check for security interests, their actual and constructive notice of the hogs' true ownership and their refusal to issue joint checks lead this court to the conclu-

sion that they were "carelessly indifferent to means of information readily at hand".

Since estoppel is an equitable remedy, the party seeking it must have clean hands. In the instant case, the evidence is sufficient to demonstrate that Wilson engaged in a charade with Misch and Howard Nelson to avoid issuing joint checks in compliance with the security agreement and thus Wilson cannot successfully assert an estoppel defense.

## VII. AVOIDABLE CONSEQUENCES

█ Wilson further maintains that PCA, in an unreasonable manner, failed to avoid any of the damages it claims from Wilson and as a result, should not be able to recover what it could have avoided. Wilson contends that "it is clear that Nelson converted the entire stock of hog collateral in late July, 1980 when he told PCA he would make no further payments."

By PCA's failure to foreclose or institute injunctive action against the Nelsons, (while allegedly knowing of the danger of harm) Wilson claims that PCA failed to avoid the consequences of the injury.

PCA responds that it did not owe Wilson any duty to take action to prevent them from converting PCA's security interest in the collateral. PCA asserts that it acted in a commercially reasonable manner in making its decision to postpone foreclosing or instituting any injunctive action against the Nelsons. During the time period in question, Howard Nelson was continually assuring PCA that arrangements to refinance the loan were pending with other lenders and that the Nelsons would soon be able to repay PCA completely.

PCA further asserts that the doctrine of avoidable consequences, like mitigation of damages, has no application to these circumstances because the defense looks to the post-tort conduct, not the pre-tort conduct. *State v. Ingram*, 427 N.E.2d 444, 448 (Ind.1981). See also RESTATEMENT OF TORTS 2d § 918 (1971).

The court finds that PCA perfected their lien on hogs produced by Nelson Farms by filing a security agreement/financing

statement as provided in Indiana's Uniform Commercial Code; and further that PCA advised Wilson of its security interest in Nelson Farm hogs in writing on September 5, 1980. PCA had no further duty to Wilson. The defense of avoidable consequences does not apply to the case at bar.

## VIII. DAMAGES

### A. *Compensatory Damages, Prejudgment and Postjudgment Interest*

PCA seeks compensatory damages in the amount of $1,495,169.01. This amount represents the fair market value of the Nelson hogs Wilson purchased between July 23, 1980, and December 31, 1981.

Wilson challenges PCA's claim for recovery of the fair market value. They propose that the proper measure of damages should be PCA's loss of collateral rather than the total sales amount of the hogs.

Indiana law sets forth the measure of damages in an action for conversion as the fair market value of the property at the time of conversion. *Plymouth Fertilizer Co., Inc. v. Balmer,* 488 N.E.2d 1129, 1140, (Ind.App., 1986), *Coffell v. Perry,* 452 N.E.2d, 1066, (Ind.App., 1983), *U.S. v. Topeka Livestock Auction, Inc.,* 392 F.Supp. 944 (N.D.Ind.1975). At trial, evidence relating to the sale of Nelson Farm hogs to Wilson sufficiently established that the fair market value of the hogs was $1,495,169.01 at the time of conversion. (See Plaintiff's Exhibit 143). The court now determines that PCA should be awarded $1,495,169.01 in compensatory damages for the fair market value of the hogs converted.

In addition PCA is entitled to prejudgment interest from the respective dates of conversion. *Coffell,* 452 N.E.2d at 1066, *Universal CIT Credit Corp. v. Shepler,* 164 Ind.App. 516, 329 N.E.2d 620, 624 (1975). The respective dates of conversion by Wilson are the sales dates upon which Wilson took possession of Nelson Farms hogs. These dates are set forth on the checks in Plaintiff's Exhibit 143. The rate of prejudgment interest is set by statute at eight percent per annum under I.C. 24–4.6–

1–102. *Wilson v. Montgomery Ward,* 610 F.Supp. 1035, 1041 (N.D.Ind.1985). Prejudgment interest is to accrue until the date of entry of this judgment on the docket of the clerk.

Postjudgment interest on an award of damages is at the rate of twelve percent per annum pursuant to I.C. 24–4.6–1–101. In a diversity action the rate of interest to be applied is that specified under the law of the state where the federal court is sitting. *Amoco Transport Company v. Dietze, Inc.,* 582 F.Supp. 804, 808 n. 5 (S.D.N.Y. 1984).

### B. *Punitive Damages*

PCA further seeks punitive damages. A claim for punitive damages must be supported by "clear and convincing evidence." *Travelers Indemnity Co. v. Armstrong,* Ind., 442 N.E.2d 349, 363 (Ind. 1982). *Orkin Exterminating Co., Inc. v. Traina,* 486 N.E.2d 1019, 1022 (Ind.1986), *Bank of New York v. Bright,* 494 N.E.2d 970, (Ind.App.,1986). The standard of proof for a claim of punitive damages is more stringent than that necessary for compensatory damages. *Bud Wolf Chevrolet, Inc. v. Robertson,* 496 N.E.2d 771, 776–777 (Ind.App., 1986), citing *Miller Pipeline Corp. v. Broeker,* 460 N.E.2d 177, 184–185, (Ind.App., 1984), *reh'g denied,* 464 N.E.2d 12. The court in *Bud Wolf* found that "there must be some evidence of malice." *Id.* at 772.

To support a claim for punitive damages "... some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, overzealousness, mere negligence or other such noniniquitous human failing." *Travelers,* 442 N.E.2d at 362.

The rationale for the higher standard of proof was set forth by the Indiana Court of Appeals as follows:

[W]hen the question of whether or not punitive damages should be given is considered, it must be done with the realization that the plaintiff has already been awarded all that he is entitled to receive

as a matter of law. What, if anything, he may be given in addition is a windfall, and in making that decision all thoughts of benefiting the injured party should be laid aside and the sole issues are whether or not the defendant's conduct was so obdurate that he should be punished for the benefit of the general public.

*Orkin,* 486 N.E.2d at 1022.

The evidence presented during this trial is insufficient to support an award of punitive damages.

### C. *Treble Damages*

 PCA claims that Wilson committed criminal mischief and under Indiana law (I.C. 34–4–30–1) it is entitled to recover treble damages from Wilson. Wilson purchased hogs it knew were owned by Nelson Farms—hogs it also knew were subject to a security interest held by PCA. PCA argues that by its purchase of secured hogs Wilson knew or intended that a deception would occur and cause PCA pecuniary loss related to its lien rights.

There is insufficient evidence that Wilson knowingly or intentionally caused PCA's pecuniary loss. PCA is not entitled to treble damages for criminal mischief.

Under Indiana law, I.C. 34–4–30–1, a person who suffers a pecuniary loss as a result of a violation of I.C. 35–43–1–2(2) may bring a civil action for treble damages, costs and attorney's fees "against the person who caused the loss."

In the partial summary judgment order of April 14, 1986, the court denied Wilson's request for summary judgment on the criminal mischief claim. The court held that there remained a factual dispute regarding whether Wilson, by purchasing the hogs, knowingly or intentionally caused PCA pecuniary loss by deception with regard to PCA's lien rights.

PCA bears the burden of establishing their criminal mischief claim by a preponderance of the evidence. *James v. Brink & Erb, Inc.,* 452 N.E.2d 414, 416 (Ind.App., 1983). PCA must establish that Wilson

(1) knowingly or intentionally

(2) caused another to suffer pecuniary loss

(3) by deception

 [or]

by expressing an intention to injure another person;

 [or]

by expressing an intention to damage the property of another person

 [or]

by expressing an intention to impair the rights of another person.

I.C. 35–43–1–2(2); See also, The Bobbs–Merrill Company, Inc., *Indiana Pattern Jury Instructions (Criminal)* pp. 115–116.

The Indiana Supreme Court has determined that statutes which are punitive in nature are to be strictly construed under application of I.C. 34–4–30–1. *Baxter v. Lyttle,* 475 N.E.2d 675, 677 (Ind.1985). A key issue is whether Wilson caused the injury or pecuniary loss suffered by PCA. Construing narrowly, as we must, the word "caused" in I.C. 35–43–1–2(2) and I.C. 34–4–30–1, it must be determined to mean that which actually produces the loss. PCA has failed to meet their burden of proof regarding the causation element.

In addressing Wilson's contention that PCA should be estopped from claiming conversion, the court has found that Wilson had notice of PCA's rights to the Nelson Farm hogs. Finding that Wilson was "carelessly indifferent" to the true ownership of the hogs is very different from finding that Wilson knowingly or intentionally *caused* PCA's loss. In contrast to the abundant evidence regarding Wilson's knowledge of Nelson's ownership, the court finds no direct evidence to establish that Wilson knew Nelson would not repay PCA. While PCA has established that Howard Nelson "caused the loss" under I.C. 34–4–30–1 and I.C. 35–43–1–2(2), they have not demonstrated a causal connection between Wilson's conversion and Nelson's failure to repay the PCA loan. PCA correctly asserts that Gilmore's actions are properly imputed to Wilson. However, the court may not impute Nelson's actions to Wilson. More importantly, however, the evidence fails to demonstrate the requisite

causal link between PCA's pecuniary loss and Wilson's actions.

Moreover, there is the element of "knowledge or intent" in relation to causation. By letter of September 5, 1980, PCA only informed Wilson of PCA's interest in the Nelson Farms hogs and that PCA requested the issuance of joint checks for any purchase of those hogs. Wilson (as well as PCA) was aware of Nelson's efforts to refinance his hog operation. This evidence is insufficient to show that Wilson knew or intended that its actions in purchasing Nelson Farms hogs would cause PCA's pecuniary loss.

In the absence of evidence sufficient to support either causation or knowledge or intent, the court cannot find that Wilson violated Indiana's criminal mischief statute. Further, the lack of a causation element defeats recovery under the treble damages provisions of Indiana law.

PCA additionally sought treble damages in conjunction with its claim of criminal conversion (I.C. 35–43–1–2). The court granted partial summary judgment in favor of Wilson on that issue. Treble damages are not available outside I.C. 34–4–30–1. The court need not address treble damages further. *Lambert v. Yellowbird, Inc.*, 496 N.E.2d 406, 409–410 (Ind.App., 1986).

### IX. ATTORNEYS' FEES

As a general rule, Indiana law does not provide for the recovery of the expenses of litigation, *Cooper v. High*, 262 Ind. 405, 317 N.E.2d 177, 179 (1974), or for the recovery of attorneys' fees. *Perry County Council v. States ex rel. Baertich*, 301 N.E.2d 219, 221 (Ind.App.1973).

However, as with treble damages, both costs and attorneys' fees are recoverable under I.C. 34–4–30–1 if the loss is based on a violation of Indiana's criminal conversion or criminal mischief statutes. The court has found against PCA on the claim of criminal mischief and the court granted partial summary judgment to Wilson as to the claim of criminal conversion. As with treble damages, costs and attorneys' fees are not available.

IT IS THEREFORE ORDERED that judgment be entered in favor of Lafayette Production Credit Association (now known as Production Credit Association of the Fourth District) and against Wilson Foods Corporation in the sum of $1,495,169.01 as compensatory damages for conversion; and

IT IS FURTHER ORDERED that Lafayette Production Credit Association (now known as Production Credit Association of the Fourth District) is awarded prejudgment interest from Wilson Foods in an amount to be computed at the rate of eight percent per annum from the respective dates of conversion until the entry of this judgment on the docket of the clerk.

IT IS FURTHER ORDERED that Lafayette Production · Credit Association (now known as Production Credit Association of the Fourth District) is entitled to post-judgment interest from Wilson Foods Corporation at the rate of twelve percent per annum on the compensatory damage award of $1,495,169.01 commencing from the date of entry of this judgment on the docket of the clerk until satisfaction of this judgment.

IT IS FURTHER ORDERED that Lafayette Production Credit Association's (now known as Production Credit Association of the Fourth District) claims for punitive damages, treble damages, and attorneys' fees are hereby DENIED.

This order is entered pursuant to designation.

APPENDIX
Plaintiff's Exhibit 143

| Misch Deposition Exhibit Number | Date on Check | Name on Check | Check Amount | Date of Deposit | Amount Deposited to Nelson Farms, Inc., per deposit slip | Amount of Check endorsed to Nelson Farms, Inc. | Amount to Nelson Farms, Inc. per testimony |
|---|---|---|---|---|---|---|---|
| 2 | 07/23/80 | Howard Nelson | 5077.29 | | | | 5077.29 |
| 3 | 07/28/80 | Howard Nelson | 10548.00 | 07/29/80 | 10548.00 | | |
| 4 | 08/01/80 | Howard Nelson | 3389.11 | 08/02/80 | 3389.11 | | |

| Misch Deposition Exhibit Number | Date on Check | Name on Check | Check Amount | Date of Deposit | Amount Deposited to Nelson Farms, Inc., per deposit slip | Amount of Check endorsed to Nelson Farms, Inc. | Amount to Nelson Farms, Inc. per testimony |
|---|---|---|---|---|---|---|---|
| 5 | 08/05/80 | Howard Nelson | 8667.30 | 08/06/80 | 8667.30 | | |
| 6 | 08/06/80 | Howard Nelson | 2206.52 | 08/07/80 | 2206.52 | | |
| 7 | 08/15/80 | Howard Nelson | 16983.85 | 08/15/80 | 16983.85 | | |
| 8 | 08/18/80 | Howard Nelson | 9894.30 | 08/21/80 | 9894.30 | | |
| 9 | 09/08/80 | J. Misch | 15112.49 | 09/08/80 | 15112.49 | | |
| 10 | 09/12/80 | J. Misch | 10621.80 | 09/12/80 | 10621.80 | | |
| 11 | 09/12/80 | J. Misch | 90.30 | 09/12/80 | 90.30 | | |
| 12 | 09/15/80 | J. Misch | 9933.65 | 09/17/80 | 9933.65 | | |
| 13 | 09/18/80 | J. Misch | 13003.05 | 09/19/80 | 13003.05 | | |
| 14 | 09/19/80 | J. Misch | 10554.15 | 09/19/80 | 10554.15 | | |
| 15 | 09/23/80 | J. Misch | 3467.36 | 09/23/80 | 3467.36 | | |
| 16 | 09/24/80 | J. Misch | 3222.87 | 09/24/80 | 3222.87 | | |
| 17 | 09/24/80 | J. Misch | 6308.16 | 09/24/80 | 6308.16 | | |
| 18 | 09/30/80 | J. Misch | 10816.87 | 10/01/80 | 10816.87 | | |
| 19 | 10/01/80 | J. Misch | 10050.00 | 10/01/80 | 10050.00 | | |
| 20 | 09/30/80 | J. Misch | 10438.80 | 10/01/80 | 10438.80 | | |
| 21 | 10/07/80 | J. Misch | 10651.65 | 10/09/80 | 10651.65 | | |
| 22 | 10/09/80 | J. Misch | 17037.26 | 10/09/80 | 17037.26 | | |
| 23 | 10/10/80 | J. Misch | 6939.87 | 10/10/80 | 6939.87 | | |
| 24 | 10/14/80 | J. Misch | 13144.70 | 10/15/80 | 13144.70 | | |
| 25 | 10/15/80 | J. Misch | 10344.32 | 10/17/80 | 10344.32 | | |
| 26 | 10/17/80 | J. Misch | 9267.83 | 10/17/80 | 9267.83 | | |
| 27 | 10/16/80 | J. Misch | 5573.31 | 10/17/80 | 5573.31 | | |
| 28 | 10/23/80 | J. Misch | 12564.82 | 10/23/80 | 12564.82 | | |
| 29 | 10/23/80 | J. Misch | 6890.35 | 10/24/80 | 6890.35 | | |
| 30 | 10/24/80 | J. Misch | 87.50 | 10/24/80 | 87.50 | | |
| 31 | 10/27/80 | J. Misch | 6137.55 | 10/27/80 | 6137.55 | | |
| 32 | 10/27/80 | J. Misch | 9479.50 | 10/27/80 | 9479.50 | | |
| 33 | 10/28/80 | J. Misch | 3366.77 | 10/28/80 | 3366.77 | | |
| 34 | 10/29/80 | J. Misch | 5741.20 | 10/29/80 | 5741.20 | | |
| 35 | 10/28/80 | J. Misch | 5524.82 | 10/29/80 | 5524.82 | | |
| 36 | 10/29/80 | J. Misch | 96.00 | 10/29/80 | 96.00 | | |
| 37 | 10/30/80 | J. Misch | 3357.11 | 10/31/80 | 3357.11 | | |
| 38 | 10/30/80 | J. Misch | 3966.64 | 10/31/80 | 3966.64 | | |
| 39 | 10/31/80 | J. Misch | 5831.65 | 10/31/80 | 5831.65 | | |
| 40 | 11/03/80 | J. Misch | 6838.62 | 11/03/80 | 6838.62 | | |
| 41 | 11/04/80 | J. Misch | 6068.36 | 11/04/80 | 6068.36 | | |
| 42 | 11/04/80 | J. Misch | 3616.80 | 11/05/80 | 3616.80 | | |
| 43 | 11/05/80 | J. Misch | 3404.80 | 11/05/80 | 3404.80 | | |
| 44 | 11/06/80 | J. Misch | 3358.65 | 11/06/80 | 3358.65 | | |
| 45 | 11/07/80 | J. Misch | 10627.35 | 11/10/80 | 10627.35 | | |
| 46 | 11/11/80 | J. Misch | 14185.50 | 11/11/80 | 14185.80 | | |
| 47 | 11/12/80 | J. Misch | 6174.02 | 11/12/80 | 6174.02 | | |
| 48 | 11/13/80 | J. Misch | 12282.20 | 11/13/80 | 12282.20 | | |
| 49 | 11/14/80 | J. Misch | 2562.95 | 11/14/80 | 2562.95 | | |
| 50 | 11/19/80 | J. Misch | 9591.70 | 11/19/80 | 9591.70 | | |
| 51 | 11/20/80 | J. Misch | 9324.40 | 11/21/80 | 9324.40 | | |
| 52 | 11/25/80 | J. Misch | 3208.50 | 11/26/80 | 3208.50 | | |
| 53 | 11/26/80 | J. Misch | 2018.10 | 11/29/80 | 2018.10 | | |
| 54 | 11/26/80 | J. Misch | 11522.10 | 11/26/80 | 11522.10 | | |
| 55 | 12/02/80 | J. Misch | 9129.10 | 12/02/80 | 9129.10 | | |
| 56 | 12/03/80 | J. Misch | 9018.37 | 12/03/80 | 9018.37 | | |
| 57 | 12/04/80 | J. Misch | 2976.57 | 12/04/80 | 2976.57 | | |
| 58 | 12/04/80 | J. Misch | 10.03 | 12/04/80 | 10.03 | | |
| 59 | 12/05/80 | J. Misch | 2823.12 | 12/05/80 | 2823.12 | | |
| 60 | 12/08/80 | J. Misch | 6834.32 | 12/08/80 | 6834.32 | | |
| 61 | 12/09/80 | J. Misch | 3127.70 | 12/09/80 | 3127.70 | | |
| 62 | 12/10/80 | J. Misch | 2797.10 | 12/12/80 | 2797.10 | | |
| 63 | 12/12/80 | J. Misch | 5772.80 | 12/12/80 | 5772.80 | | |
| 64 | 12/15/80 | J. Misch | 3223.57 | 12/15/80 | 3223.57 | | |
| 65 | 12/17/80 | J. Misch | 3175.07 | 12/18/80 | 3175.07 | | |
| 66 | 12/18/80 | J. Misch | 15872.67 | 12/19/80 | 15872.67 | | |
| 67 | 12/18/80 | J. Misch | 136.00 | 12/19/80 | 136.00 | | |
| 68 | 12/19/80 | J. Misch | 3058.85 | 12/19/80 | 3058.85 | | |
| 69 | 12/23/80 | J. Misch | 5773.50 | 12/23/80 | 5773.50 | | |
| 70 | 12/29/80 | J. Misch | 7916.65 | 12/30/80 | 7916.65 | | |
| 71 | 01/05/81 | J. Misch | 10700.25 | 01/06/81 | 10700.25 | | |
| 72 | 01/07/81 | J. Misch | 6561.35 | 01/08/81 | 6561.35 | | |
| 73 | 01/08/81 | J. Misch | 5405.05 | 01/09/81 | 5405.05 | | |
| 74 | 01/15/81 | J. Misch | 18515.67 | 01/16/81 | 18515.67 | | |
| 75 | 01/16/81 | J. Misch | 19039.06 | 01/18/81 | 19039.06 | | |
| 76 | 01/23/81 | J. Misch | 228.21 | 01/23/81 | 228.21 | | |
| 77 | 01/26/81 | J. Misch | 14201.76 | 01/27/81 | 14201.76 | | |

| Misch Deposition Exhibit Number | Date on Check | Name on Check | Check Amount | Date of Deposit | Amount Deposited to Nelson Farms, Inc., per deposit slip | Amount of Check endorsed to Nelson Farms, Inc. | Amount to Nelson Farms, Inc. per testimony |
|---|---|---|---|---|---|---|---|
| 78 | 01/27/81 | J. Misch | 2840.06 | 01/27/81 | 2840.06 | | |
| 79 | 01/27/81 | J. Misch | 6052.94 | 01/27/81 | 6052.94 | | |
| 80 | 02/05/81 | J. Misch | 8219.81 | 02/06/81 | 8219.81 | | |
| 81 | 02/09/81 | Nelson Pork Fact. | 3299.10 | 02/09/81 | 3299.10 | | |
| 82 | 02/09/81 | J. Misch | 2264.00 | 02/09/81 | 2264.00 | | |
| 83 | 02/09/81 | Nelson Pork Fact. | 8578.90 | 02/09/81 | 8578.90 | | |
| 84 | 02/02/81 | J. Misch | 63.00 | 02/09/81 | 63.00 | | |
| 85 | 02/13/81 | Nelson Pork Fact. | 9038.60 | 02/13/81 | 9038.60 | | |
| 86 | 02/18/81 | Nelson Pork Fact. | 6100.87 | 02/20/81 | 6100.87 | | |
| 87 | 02/17/81 | Jot Acres | 2986.35 | 02/18/81 | 2986.35 | | |
| 88 | 02/17/81 | Nelson Pork Fact. | 6523.10 | 02/18/81 | 6523.10 | | |
| 89 | 02/16/81 | J. Misch | 3.31 | 02/16/81 | 3.31 | | |
| 90 | 02/19/81 | J. Misch | 8974.40 | 02/19/81 | 8974.40 | | |
| 91 | 02/19/81 | Nelson Pork Fact. | 6149.00 | 02/19/81 | 6149.00 | | |
| 92 | 02/23/81 | Nelson Pork Fact. | 5544.12 | 02/23/81 | 5544.12 | | |
| 93 | 02/23/81 | Nelson Pork Fact. | 174.00 | 02/24/81 | 174.00 | | |
| 94 | 02/24/81 | J. Misch | 7233.19 | 02/24/81 | 7233.19 | | |
| 95 | 02/24/81 | J. Misch | 6279.20 | 02/24/81 | 6279.20 | | |
| 96 | 03/02/81 | J. Misch | 8829.00 | 03/02/81 | 8829.00 | | |
| 97 | 03/02/81 | Nelson Pork Fact. | 7226.00 | 03/02/81 | 7226.00 | | |
| 98 | 03/03/81 | Nelson Pork Fact. | 6098.00 | 03/03/81 | 6098.00 | | |
| 99 | 03/06/81 | Nelson Pork Fact. | 7694.22 | 03/06/81 | 7694.22 | | |
| 100 | 03/09/81 | Nelson Pork Fact. | 10940.67 | 03/09/81 | 10940.67 | | |
| 101 | 03/10/81 | J. Misch | 10623.19 | 03/10/81 | 10623.19 | | |
| 102 | 03/11/81 | Nelson Pork Fact. | 5291.62 | 03/11/81 | 5291.62 | | |
| 103 | 03/11/81 | Nelson Pork Fact. | 70.00 | 03/11/81 | 70.00 | | |
| 105 | 03/13/81 | J. Misch | 15644.60 | 03/13/81 | 15644.60 | | |
| 106 | 03/14/81 | Nelson Pork Fact. | 5911.10 | 03/16/81 | 5911.10 | | |
| 107 | 03/17/81 | J. Misch | 7582.50 | 03/18/81 | 7582.50 | | |
| 108 | 03/18/81 | J. Misch | 3240.75 | 03/18/81 | 3240.75 | | |
| 109 | 03/20/81 | J. Misch | 8160.90 | 03/21/81 | 8160.90 | | |
| 110 | 03/23/81 | Nelson Pork Fact. | 5635.90 | 03/24/81 | 5635.90 | | |
| 111 | 03/24/81 | J. Misch | 5873.00 | 03/24/81 | 5873.00 | | |
| 112 | 03/26/81 | J. Misch | 3123.85 | 03/27/81 | 3123.85 | | |
| 113 | 03/26/81 | Nelson Pork Fact. | 5893.40 | 03/27/81 | 5893.40 | | |
| 114 | 03/31/81 | Nelson Pork Fact. | 5380.90 | 03/31/81 | 5380.90 | | |
| 115 | 04/01/81 | Nelson Pork Fact. | 8248.00 | 04/01/81 | 8248.00 | | |
| 116 | 04/03/81 | J. Misch | 8091.57 | 04/03/81 | 8091.57 | | |
| 117 | 04/07/81 | Nelson Pork Fact. | 8000.00 | 04/07/81 | 8000.00 | | |
| 118 | 04/08/81 | J. Misch | 19009.80 | 04/08/81 | 19009.80 | | |
| 119 | 04/06/81 | Nelson Pork Fact. | 80.50 | 04/06/81 | 80.50 | | |
| 120 | 04/10/81 | J. Misch | 15935.70 | 04/10/81 | 15935.70 | | |
| 121 | 04/17/81 | J. Misch | 8027.92 | 04/17/81 | 8027.92 | | |
| 122 | 04/17/81 | Nelson Pork Fact. | 7200.85 | 04/17/81 | 7200.85 | | |
| 124 | 04/28/81 | J. Misch | 8379.36 | 04/28/81 | 8379.36 | | |
| 125 | 04/29/81 | J. Misch | 2713.10 | 04/29/81 | 2713.10 | | |
| 126 | 05/05/81 | J. Misch | 8489.25 | 05/05/81 | 8489.25 | | |
| 127 | 05/05/81 | Nelson Pork Fact. | 8308.00 | 05/05/81 | 8308.00 | | |
| 128 | 05/05/81 | Nelson Pork Fact. | 398.02 | 05/05/81 | 398.02 | | |
| 129 | 05/08/81 | Nelson Pork Fact. | 2997.10 | 05/08/81 | 2997.10 | | |
| 130 | 05/08/81 | J. Misch | 6158.20 | 05/08/81 | 6158.20 | | |
| 131 | 05/12/81 | J. Misch | 5791.32 | | | 5791.32 | |
| 132 | 05/12/81 | Nelson Pork Fact. | 2624.87 | | | 2624.87 | |
| 133 | 05/15/81 | J. Misch | 2615.37 | 05/15/81 | 2615.37 | | |
| 134 | 05/19/81 | J. Misch | 16326.01 | 05/19/81 | 16326.01 | | |
| 135 | 05/21/81 | J. Misch | 11703.60 | 05/26/81 | 11703.60 | | |
| 136 | 05/26/81 | J. Misch | 17488.25 | 05/27/81 | 17488.25 | | |
| 137 | 05/29/81 | J. Misch | 4793.67 | 05/29/81 | 4793.67 | | |
| 138 | 05/29/81 | Nelson Pork Fact. | 4367.85 | 05/29/81 | 4367.85 | | |
| 139 | 05/26/81 | J. Misch | 18.90 | 05/29/81 | 18.90 | | |
| 140 | 06/03/81 | J. Misch | 9189.72 | 06/03/81 | 9189.72 | | |
| 141 | 06/05/81 | Nelson Pork Fact. | 3168.75 | 06/05/81 | 3168.75 | | |
| 142 | 06/05/81 | J. Misch | 9275.12 | 06/05/81 | 9275.12 | | |
| 143 | 06/09/81 | J. Misch | 9705.67 | 06/10/81 | 9705.67 | | |
| 144 | 06/12/81 | Nelson Pork Fact. | 9076.62 | 06/12/81 | 9076.62 | | |
| 145 | 06/16/81 | J. Misch | 2779.42 | 06/16/81 | 2779.42 | | |
| 146 | 06/17/81 | Nelson Pork Fact. | 9523.92 | 06/17/81 | 9523.92 | | |
| 147 | 06/22/81 | Nelson Pork Fact. | 9525.29 | 06/22/81 | 9525.29 | | |

| Misch Deposition Exhibit Number | Date on Check | Name on Check | Check Amount | Date of Deposit | Amount Deposited to Nelson Farms, Inc., per deposit slip | Amount of Check endorsed to Nelson Farms, Inc. | Amount to Nelson Farms, Inc. per testimony |
|---|---|---|---|---|---|---|---|
| 148 | 06/23/81 | J. Misch | 10865.07 | 06/23/81 | 10865.07 | | |
| 149 | 06/25/81 | J. Misch | 20761.24 | 06/25/81 | 20761.24 | | |
| 150 | 06/25/81 | Nelson Pork Fact. | 11033.95 | 06/25/81 | 11033.95 | | |
| 151 | 06/30/81 | Nelson Pork Fact. | 4474.78 | 06/29/81 | 4474.78 | | |
| 152 | 06/30/81 | J. Misch | 8747.15 | 06/29/81 | 8747.15 | | |
| 153 | 06/26/81 | Nelson Pork Fact. | 94.41 | 07/09/81 | 94.41 | | |
| 154 | 07/09/81 | J. Misch | 8562.00 | 07/09/81 | 8562.00 | | |
| 155 | 07/14/81 | Nelson Pork Fact. | 9226.14 | 07/14/81 | 9226.14 | | |
| 156 | 07/21/81 | J. Misch | 9637.77 | 07/21/81 | 9637.77 | | |
| 157 | 07/30/81 | J. Misch | 3818.26 | 07/30/81 | 3818.26 | | |
| 158 | 07/30/81 | Nelson Pork Fact. | 6065.45 | 07/30/81 | 6065.45 | | |
| 160 | 08/04/81 | Nelson Pork Fact. | 9986.07 | 08/05/81 | 9986.07 | | |
| 162 | 08/05/81 | Nelson Pork Fact. | 9801.30 | 08/05/81 | 9801.30 | | |
| 164 | 08/05/81 | Nelson Pork Fact. | 8564.40 | 08/05/81 | 8564.40 | | |
| 166 | 08/10/81 | J. Misch | 4569.53 | 08/10/81 | 4569.53 | | |
| 168 | 08/11/81 | Nelson Pork Fact. | 18884.22 | 08/11/81 | 18884.22 | | |
| 169 | 08/12/81 | Nelson Pork Fact. | 306.00 | 08/12/81 | 306.00 | | |
| 170 | 08/12/81 | Howard Nelson, Jr. | 7598.25 | 08/13/81 | | 7598.25 | |
| 171 | 08/17/81 | Nelson Pork Fact. | 9290.72 | 08/17/81 | 9290.72 | | |
| 172 | 08/18/81 | J. Misch | 9497.90 | 08/18/81 | 9497.90 | | |
| 176 | 08/21/81 | Nelson Pork Fact. | 9821.76 | 08/21/81 | 9821.76 | | |
| 177 | 08/24/81 | J. Misch | 9437.07 | 08/24/81 | 9437.07 | | |
| 178 | 08/25/81 | Nelson Pork Fact. | 19457.05 | 08/25/81 | 19457.05 | | |
| 179 | 08/31/81 | Nelson Pork Fact. | 8234.92 | 08/31/81 | 8234.92 | | |
| 180 | 08/31/81 | Nelson Pork Fact. | 78.20 | 08/31/81 | 78.20 | | |
| 181 | 09/03/81 | J. Misch | 9662.15 | 09/03/81 | 9662.15 | | |
| 182 | 09/08/81 | J. Misch | 7505.50 | 09/08/81 | 7505.50 | | |
| 184 | 09/10/81 | J. Misch | 10.94 | 09/10/81 | 10.94 | | |
| 185 | 09/10/81 | Nelson Pork Fact. | 17908.92 | 09/10/81 | 17908.92 | | |
| 187 | 09/15/81 | Nelson Pork Fact. | 9732.10 | 09/15/81 | 9732.10 | | |
| 191 | 09/21/81 | Nelson Pork Fact. | 10055.02 | 09/21/81 | 10055.02 | | |
| 192 | 09/22/81 | Nelson Pork Fact. | 10166.96 | 09/22/81 | 10166.96 | | |
| 193 | 09/22/81 | Nelson Pork Fact. | 27.61 | 09/22/81 | 27.61 | | |
| 195 | 09/23/81 | Nelson Pork Fact. | 8099.05 | 09/23/81 | 8099.05 | | |
| 197 | 09/28/81 | J. Misch | 9315.60 | 09/28/81 | 9315.60 | | |
| 198 | 09/29/81 | Nelson Pork Fact. | 4890.60 | 09/29/81 | 4890.60 | | |
| 199 | 10/06/81 | J. Misch | 8940.04 | 10/06/81 | 8940.04 | | |
| 201 | 10/12/81 | J. Misch | 6492.50 | 10/12/81 | 6492.50 | | |
| 204 | 10/21/81 | Nelson Pork Fact. | 7363.90 | 10/21/81 | 7363.90 | | |
| 206 | 10/23/81 | Nelson Pork Fact. | 3974.50 | 10/23/81 | 3974.50 | | |
| 208 | 10/26/81 | Nelson Pork Fact. | 6720.20 | 10/26/81 | | 6720.20 | |
| 209 | 10/26/81 | Nelson Pork Fact. | 1588.85 | 10/28/81 | 1588.85 | | |
| 210 | 10/26/81 | Nelson Pork Fact. | 7516.07 | 10/26/86 | 7516.07 | | |
| 211 | 10/28/81 | Nelson Pork Fact. | 8498.14 | 10/28/81 | 8498.14 | | |
| 213 | 11/02/81 | Nelson Pork Fact. | 16877.92 | 11/02/81 | 16877.92 | | |
| 214 | 11/04/81 | Nelson Pork Fact. | 7427.54 | 11/04/81 | 7427.54 | | |
| 216 | 11/09/81 | Nelson Pork Fact. | 15915.95 | 11/12/81 | 15915.95 | | |
| 217 | 11/12/81 | Nelson Pork Fact. | 112.50 | 11/12/81 | 112.50 | | |
| 218 | 11/12/81 | Nelson Pork Fact. | 676.80 | 11/12/81 | 676.80 | | |
| 219 | 11/12/81 | Nelson Pork Fact. | 8054.20 | 11/16/81 | 8054.20 | | |
| 220 | 11/16/81 | Nelson Pork Fact. | 8855.20 | 11/16/81 | 8855.20 | | |
| 221 | 11/20/81 | Nelson Pork Fact. | 7923.58 | 11/20/81 | 7923.58 | | |
| 223 | 11/19/81 | Nelson Pork Fact. | 57.50 | 12/07/81 | 57.50 | | |
| 226 | 11/23/81 | J. Misch | 1000.00 | 11/23/81 | | | 1000.00 |
| 229 | 11/30/81 | Nelson Pork Fact. | 16717.89 | 11/30/81 | 16717.89 | | |
| 230 | 12/02/81 | Nelson Pork Fact. | 9154.55 | 12/02/81 | 9154.55 | | |
| 232 | 12/07/81 | Nelson Pork Fact. | 7094.77 | 12/07/81 | 7094.77 | | |
| 233 | 12/07/81 | Nelson Pork Fact. | 14500.00 | | | 14500.00 | |
| 234 | 12/04/81 | Nelson Pork Fact. | 216.00 | 12/09/81 | 216.00 | | |
| 235 | 12/07/81 | Nelson Pork Fact. | 1952.67 | 12/09/81 | 1952.67 | | |
| 236 | 12/18/81 | Nelson Pork Fact. | 4176.67 | 12/18/81 | 4176.67 | | |
| 237 | 12/24/81 | Nelson Pork Fact. | 3321.00 | 12/24/81 | 3321.00 | | |
| 238 | 12/30/81 | Nelson Pork Fact. | 2826.90 | 12/30/81 | 2826.90 | | |
| Totals: | | | 1,495,169.01 | | 1,451,857.08 | $42,311.93 | $1,000.00 |